Stanley NEITZEL, Appellant,

v.

STATE of Alaska, Appellee.

No. 6243.

Court of Appeals of Alaska.

Nov. 19, 1982.

Susan Orlansky, Asst. Public Defender, and Dana Fabe, Public Defender, Anchorage, for appellant.

William H. Hawley, and Elizabeth Sheley, Asst. Attys. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

SINGLETON, Judge.

Stanley Neitzel shot his girlfriend, Irene Reedy, in the head causing her death. The

undisputed evidence establishes that Neitzel fired a number of shots directly at Reedy while she sat on the ground. Many of these earlier bullets struck the ground within an inch of Ms. Reedy before the fatal shot entered her head. Eyewitnesses were unsure of whether Neitzel fired at Reedy to discipline her for drinking vodka which belonged to him, to frighten her, to demonstrate his marksmanship by seeing how close he could come without hitting her, or to just have fun with his rifle. Neitzel denied any recollection of the incident. Two hours after the shooting his blood alcohol level was .15%. The state offered expert testimony suggesting that Neitzel's blood alcohol level could have been as high as .18% at the time of the crime. Neitzel was convicted of second degree murder in violation of AS 11.41.110(a)(2), which provides in relevant part:

> *Murder in the Second Degree.* (a) A person commits the crime of murder in the second degree if
>
> . . . .
>
> (2) he intentionally performs an act that results in the death of another person under circumstances manifesting an extreme indifference to the value of human life . . . .

The trial court held that this statute did not require a specific intent and consequently Neitzel's intoxication at the time of Reedy's death was not a defense. Neitzel raises a number of objections in his appeal, but it is clear that these objections simply restate the propositions that he could only be convicted if (1) he intended to shoot *at Reedy,* and (2) he was reckless in evaluating the circumstances, *i.e.,* knew that shooting at Reedy endangered her life. According to the first prong of Neitzel's argument, he was entitled to an instruction that required the jury to consider his intoxication in determining whether he intended to shoot at Reedy. The trial court instructed the jury that intoxication was not a defense. According to the second prong of his argument, he was entitled to an instruction telling the jury that he personally must have

known of the danger to Reedy before he could be convicted. In other words, a jury determination that the reasonably prudent person similarly situated would have been aware of the risk to Reedy was insufficient for conviction. We reject the first prong of Neitzel's argument but accept in part the second prong. We determine, nevertheless, that any error was harmless beyond reasonable doubt and therefore affirm the decision of the trial court.

To be guilty of second degree murder, the defendant must *inter alia* "intentionally" perform an act, such as intentionally shooting a gun. AS 11.81.900 provides in relevant part:

> (a) for purposes of this title, unless the context requires otherwise,
>
> (1) a person acts "intentionally" with respect to a result described by a provision of law defining an offense when his conscious objective is to cause that result . . . .

■ After carefully reviewing the code and considering the history of its enactment, we are convinced that the word "intentionally" in AS 11.41.110(a)(2) was not used "with respect to a result" and therefore was not governed by AS 11.81.-900(a)(1). We conclude it should be given the meaning assigned to "knowingly" in the code definitions. "Knowingly" is defined as follows:

> [A] person acts "knowingly" with respect to conduct or to a circumstance described by a provision of law defining an offense when he is aware that his conduct is of that nature or that the circumstance exists; when knowledge of the existence of a particular fact is an element of an offense, that knowledge is established if a person is aware of a substantial probability of its existence, unless he actually believes it does not exist; a person who is unaware of conduct or a circumstance of which he would have been aware had he not been intoxicated acts knowingly with respect to that conduct or circumstance
>
> . . . .

AS 11.81.900(a)(2).

In order to understand the legislature's intentions in enacting AS 11.41.110(a)(2), it

is necessary to briefly trace the evolution of what can best be described as reckless murder through the common law, the Model Penal Code, upon which our current statutes are modeled, the tentative draft prepared by the Alaska Code Revision Commission, Subcommission on Criminal Law (hereafter referred to as the Tentative Draft), and the Alaska Revised Criminal Code ultimately enacted by the legislature (hereafter referred to as the Revised Code). When such a study is completed, we believe the legislature's intent is clear.

At common law, murder was homicide committed with "malice aforethought." R. Perkins, *Criminal Law* § 1, at 34 (2d ed. 1969). "Aforethought" suggests planning but this term fell into disuse leaving "malice" the significant term differentiating murder from other forms of culpable homicide. *Id.* at 34–35. Malice was primarily defined to mean an intent to kill in the absence of (1) justification, (2) excuse, or (3) mitigation. *Id.* at 35.

This definition was subject to an exception which is central to the issue before us. Common law courts permitted a jury to find malice in the absence of a specific intent to kill where "in the absence of any circumstance of exculpation or mitigation an act [was] done with such heedless disregard of a harmful result, foreseen as a likely possibility, that it differs little in the scale of moral blameworthiness from an actual intent to cause such harm." *Id.* at 768. To distinguish such a crime from intentional murder, it is useful to call it "reckless murder," and to distinguish its *mens rea* from an intent to kill by calling it "constructive malice."

Typical examples of this kind of murder are: shooting, regardless of the consequences, into a home, room, train, or automobile in which others are known to be or might be. *Id.* at 36. Perkins calls the mental state accompanying such an act "a man-endangering-state-of-mind." *Id.* at 759.

The Tentative Draft prepared by the Subcommission on Criminal Law was based on a number of recent state codifications of criminal law. These codes in turn were substantially derived from the New York Revised Penal Code of 1965 which was based on the Model Penal Code.

A number of common law concepts underwent substantial modification in the American Law Institute's Model Penal Code (proposed official draft) which was published in 1962 (hereafter referred to as Model Penal Code). The Model Penal Code in turn underwent modification in the enactment of the New York Penal Code of 1965, at the hands of the Subcommission on Criminal Law which published its Tentative Draft in 1977, in the Revised Code enacted in 1978, and in the additional amendments added to our code in 1980. Nevertheless, the Model Penal Code is the foundation upon which our code rests and a researcher interested in discovering the meaning of a given Alaskan criminal statute must begin with the Model Penal Code and its comments and follow the evolution of the statute in question through the New York Penal Code of 1965 and the Alaska Tentative Draft to its place in the Revised Code. Having completed such a study, we are satisfied that the legislature intended to retain "reckless murder" essentially as it existed at common law. As always with statutory construction, what the legislature altered, modified, or eliminated from the Model Penal Code is often as important as what was retained. But, in evaluating modifications and comparing corresponding sections, it is wise to remember that the arrangement of sections and subsections sometimes differs between the Model Penal Code and its successors even though the substance remains the same. It is therefore necessary to review the code as a whole to make certain that what appears to be a substantial change in the Revised Code is not merely a minor variation in phrasing.

In this case we must review three Model Penal Code concepts: (1) culpable mental states; (2) the Model Penal Code definition of reckless murder (particularly the differences between reckless murder, as conceived by the drafters of the Model Penal Code, and manslaughter); and (3) finally, the treatment of intoxication as a defense

in the Model Penal Code, the Tentative Draft, and our Revised Code. Such a review will clarify the legislature's intent in defining reckless murder and the part intoxication plays in defending against a charge of reckless murder.

## CULPABLE MENTAL STATES

The Model Penal Code provides that with the exception of violations and other strict liability offenses, with which we are not here concerned, a person is not guilty of an offense unless "he acted purposefully, knowingly, recklessly or negligently, as the law may require, with respect to each material element of the offense." Model Penal Code § 2.02. This requirement is also found in the Tentative Draft, proposed AS 11.11.100 and .110, and in the Revised Code, AS 11.81.600 and .610.[1]

The Model Penal Code, the Tentative Draft, and the Revised Code segregate ma-

1. AS 11.81.600 and .610 as originally enacted provided:

Sec. 11.81.600. *General requirements of culpability.*

(a) The minimal requirement for criminal liability is the performance by a person of conduct which includes a voluntary act or the omission to perform an act which he is capable of performing.

(b) A person is not guilty of an offense unless he acts with a culpable mental state with respect to each element of the offense, except that

(1) *no culpable mental state must be proved with respect to any element of an offense if the description of the offense does not specify a culpable mental state and the offense is*

(A) a violation; or

(B) designated as one of "strict liability";

(2) no culpable mental state must be proved with respect to a particular element of the offense if an intent to dispense with the culpable mental state requirement for that element clearly appears.

Sec. 11.81.610. *Construction of statutes with respect to culpability.*

(a) When only one culpable mental state appears in a provision of law defining an offense, it is rebuttably presumed to apply to every element of the offense unless an intent to limit its application clearly appears.

(b) Except as provided in § 600(b) of this chapter, if a provision of law defining an offense does not prescribe a culpable mental state, the culpable mental state that must be proved with respect to

(1) conduct is "knowingly"; and

(2) a circumstance or a result is "recklessly."

(c) When a provision of law provides that criminal negligence suffices to establish an element of an offense, that element is also established if a person acts intentionally, knowingly, or recklessly. If acting recklessly suffices to establish an element, that element also is established if a person acts intentionally or knowingly. If acting knowingly suf-

fices to establish an element, that element is also established if a person acts intentionally. These sections were amended in 1980 to provide:

Sec. 11.81.600. *General requirements of culpability.*

(a) The minimal requirement for criminal liability is the performance by a person of *conduct which includes a voluntary act or the omission to perform an act which he is capable of performing.*

(b) A person is not guilty of an offense unless he acts with a culpable mental state, except that *no culpable mental state must be proved*

(1) if the description of the offense does not specify a culpable mental state and the offense is

(A) a violation; or

(B) designated as one of "strict liability"; or

(2) if a legislative intent to dispense with the culpable mental state requirement is present.

Sec. 11.81.610. *Construction of statutes with respect to culpability.*

(a) Repealed by § 44 ch 102 SLA 1980.

(b) Except as provided in AS 11.81.600(b), if a provision of law defining an offense does not prescribe a culpable mental state, the culpable mental state that must be proved with respect to

(1) conduct is "knowingly"; and

(2) a circumstance or a result is "recklessly."

(c) When a provision of law provides that criminal negligence suffices to establish an element of an offense, that element is also established if a person acts intentionally, knowingly, or recklessly. If acting recklessly suffices to establish an element, that element also is established if a person acts intentionally or knowingly. If acting knowingly suffices to establish an element, that element is also established if a person acts intentionally.

In explaining the amendments to AS 11.81.-600, the responsible legislative committee stated:

terial elements of offenses into three categories: (1) the nature of the conduct; (2) the circumstances surrounding the conduct; and (3) the results of the conduct. The Senate Committee Report which accompanied the enactment of the Revised Code describes these terms as follows:

The Code distinguishes between three elements of offenses to which the culpable mental states apply

. . . .

The first element, conduct, involves the nature of the proscribed act or the manner in which the defendant acts. Kidnapping, for example, requires that one person restrain another. The conduct might be the locking of the only door to a windowless room. Knowingly is the culpable mental state applicable to conduct. The second element, circumstances surrounding the conduct, refers to a situation having a bearing on the actor's culpability. Kidnapping requires that the person inside the room not consent to being restrained. Lack of consent is an example of a circumstance surrounding the actor's conduct, and is an element of the crime. Knowingly, recklessly, and criminal negligence are the culpable mental states associated with the existence of circumstances. The result of the actor's conduct constitutes the final element. Kidnapping can occur if the victim is exposed to a substantial risk of serious physical injury. Intentionally, recklessly and criminal negligence are the culpable mental states associated with results.

2 Senate Journal Supplement No. 47, at 140 (June 12, 1978). *See* Tentative Draft Part 2, at 14–15 (1977).

The culpable mental states referred to in the Tentative Draft are essentially the same as those mentioned in the Model Penal Code: purposefully, knowingly, recklessly, or negligently. *Compare* Model Penal Code § 2.02 *with* Tentative Draft 11.11.110 (the Tentative Draft substitutes the word "intentionally" for the word "purposefully"). The Tentative Draft defines "intentionally" using almost the same words that the Model Penal Code uses to define "purposefully," except that "purposefully" in the Model Penal Code can relate to the surrounding circumstances while the Tentative Draft restricts "intentionally" to conduct and results. *Compare* Model Penal Code § 2.02(a) *with* Tentative Draft 11.11.140(a)(1), which is substantially identical to New York Penal

---

This amendment makes two changes regarding the code's general rules on culpability. The first is to clarify the general rule concerning culpability and to make clear that, with certain specified exceptions, a culpable mental state *must* be proven for every crime. For example, to commit Burglary in the Second Degree the state must establish that the defendant entered or remained unlawfully in a building with intent to commit a crime. The culpable mental state in this case is the intent to commit a crime. If the state establishes a voluntary act by the defendant in entering or remaining in a building, and in addition shows he acted with the intent to commit a crime, the crime of Burglary in the Second Degree has been established.

The second change provides that culpability need not be established if a legislative intent to dispense with the culpability requirement appears. While the decision to eliminate the culpable mental state requirement must comport with constitutional due process guarantees, the courts should be specifically authorized to consider the legislature's intent (and most importantly, the commentary accompanying passage of the code) in determining whether the legislature intended to dispense with the culpability requirement in a particular statute.

2 Senate Journal Supplement No. 44, at 18–19 (May 29, 1980).

The amendment to AS 11.81.610 was explained as follows:

The second amendment repeals AS 11.81.-610(a) which provides that the use of one culpable mental state in a statute rebuttably presumes that the mental state applies to all elements of the crime. This rule is inappropriately broad and ignores the fact that, by definition, particular mental states only apply to particular elements of a crime. For example, "intentionally" only applies to elements of crimes that can be classified as "results" as opposed to "circumstances" or "conduct" to which the culpable mental state "knowingly" applies. Because of the requirement set forth in AS 11.81.600(b) . . . that ordinarily only one culpable mental state is required to be established for each crime, this section is superfluous and misleading.

2 Senate Journal Supplement No. 44, at 28 (May 29, 1980).

These amendments and the state's arguments based upon them will be discussed hereafter.

Code § 15.05(1). "Knowingly" is defined similarly in the Model Penal Code and the Tentative Draft except that the Tentative Draft limits "knowingly" to conduct and circumstances while the Model Penal Code permits "knowingly" to govern a result. *Compare* Model Penal Code § 2.02(2)(b) *with* Tentative Draft 11.11.140(a)(2).

"Recklessly" and "negligently" are defined in essentially the same way in both the Tentative Draft and the Model Penal Code. *Compare* Model Penal Code § 2.02(2)(c) *with* Tentative Draft 11.11.140(a)(3) and Model Penal Code § 2.02(2)(d) *with* Tentative Draft 11.11.140(4). As we shall see, both the Model Penal Code and the Tentative Draft require knowledge of the risk presented by the actor's conduct before he can be found to have acted "recklessly," but both preclude consideration of "intoxication" in determining whether he had the requisite knowledge. *Accord* New York Penal Code § 15.05(3).

The foregoing provisions were incorporated into the Alaska Revised Code with only minor stylistic changes. The code retains from the Tentative Draft the three-fold division of elements of an offense into conduct, surrounding circumstances, and results. It also retains the four culpable mental states: intentionally, knowingly, recklessly, and criminal negligence. Knowingly, recklessly, and criminal negligence are defined as in the Tentative Draft. *Compare* AS 11.81.900(a)(1), (2), and (3) *with* Tentative Draft 11.11.140(a)(1), (2), and (3). The Revised Code, however, limits the scope of the term "intentionally" to govern only results while the Tentative Draft allows "intentionally" to govern conduct and results and the Model Penal Code uses the synonymous term "purposefully" to govern conduct, circumstances, and results. *Compare* Model Penal Code § 2.02(2)(a) *with* Tentative Draft 11.11.140(a)(1) and AS 11.81.900(a)(1).

For our present purposes, the primary difference between the Model Penal Code, the Tentative Draft, and the Revised Code (if we reserve for later discussion their respective treatment of intoxication) lies in the progressive narrowing of the scope of the term "intentionally." With this background we can now undertake an analysis of the code's treatment of "intoxication" as a defense.

## INTOXICATION

The Model Penal Code contains the following provision regarding intoxication:

(1) Except as provided in Subsection (4) of this Section [relating to involuntary intoxication], intoxication of the actor is not a defense unless it negatives an element of the offense.

(2) When recklessness establishes an element of the offense, if the actor, due to self-induced intoxication, is unaware of a risk of which he would have been aware had he been sober, such unawareness is immaterial.

Model Penal Code § 2.08. The Tentative Draft is substantially the same. It provides:

(a) Voluntary intoxication or drug use does not, as such, constitute a defense to a criminal charge, but in a prosecution for an offense, evidence that the defendant used drugs or was intoxicated may be offered whenever it is relevant to negate an element of the crime that requires a culpable mental state.

(b) When recklessness establishes an element of the offense, if the defendant, due to voluntary intoxication or drug use, is unaware of a risk of which he would have been aware had he not been intoxicated or not using drugs, that unawareness is immaterial.

Tentative Draft 11.11.130. The defense is substantially narrowed in the Revised Code. AS 11.81.630 provides in relevant part:

Voluntary intoxication is not a defense to a prosecution for an offense, but evidence that the defendant was intoxicated may be offered whenever it is relevant to negate an element of the offense that requires that the defendant intentionally cause a result.

Thus, in the Tentative Draft, as in the Model Penal Code, intoxication is relevant

with regard to any offense that requires knowledge or intent as the culpable mental element. Only where the culpable mental element is recklessness do these codes preclude jury consideration of intoxication. It should be noted that the Model Penal Code commentary makes it clear that the rule barring evidence of intoxication is a rule of substantive law, not of evidence. Thus, the drafters of the Model Penal Code recognized that as a matter of evidence intoxication is relevant wherever a mental state including recklessness is an issue. What the drafters have done is resolve, as a matter of policy, to define offenses to exclude consideration of intoxication. The reasons for this decision will be discussed later in connection with Neitzel's contention that such a determination violates due process of law. It is important to recognize that the Revised Code went beyond the Tentative Draft and the Model Penal Code in excluding evidence of intoxication where an offense required that the offender act "knowingly." Thus, under the Revised Code, evidence of intoxication is only admissible where the offense requires that a person act "intentionally" as defined in AS 11.81.-900(a)(1). In conclusion, the Model Penal Code and the Tentative Draft provide that recklessness may be found despite unawareness of a risk where intoxication accounts for the failure to perceive the risk. Model Penal Code § 2.08(2); Tentative Draft 11.-11.130(b). This provision is also found in the Revised Code. AS 11.81.900(a)(3). In addition, the Revised Code provides that "a person who is unaware of conduct or a circumstance of which he would have been aware had he not been intoxicated acts knowingly with respect to that conduct or circumstance." AS 11.81.900(a)(2). This provision which does not occur in either the Model Penal Code or the Tentative Draft reinforces the modification to what is now AS 11.81.630 in establishing a legislative determination that only intent to cause a result can be negated by evidence of intoxication.

## RECKLESS MURDER

We may now proceed to review "constructive malice murder" as it progressed from the Model Penal Code through the Tentative Draft to the Revised Code. Since this form of murder is closely related to manslaughter, it is necessary to discuss that crime as well.

The Model Penal Code and the Tentative Draft establish one offense of murder which can be committed purposefully, knowingly, or, under limited circumstances, recklessly. The Tentative Draft differs from the Model Penal Code in substituting the word "intentionally" for "purposefully." *Compare* Model Penal Code § 210.2 *with* Tentative Draft 11.41.110. The Model Penal Code also differs from the Tentative Draft in requiring that felony murder be committed "recklessly" while the Tentative Draft permits an accidental felony murder. *Compare* Model Penal Code § 210.2(b) *with* Tentative Draft 11.41.110(a)(3). The Tentative Draft also follows the common law in making an act motivated by an intent to cause serious physical injury resulting in death sufficient for murder. Tentative Draft 11.41.110(a)(1). The Model Penal Code apparently treats this as a possible example of reckless murder. Model Penal Code § 210.2(b); A.L.I., *Model Penal Code and Commentaries,* Part II § 210.2, at 28–29 (1980).

The Model Penal Code and the Tentative Draft generally define manslaughter in the same way. *Compare* Model Penal Code § 210.3 *with* Tentative Draft 11.41.110(b) and 11.41.120. They include reckless homicide as well as intentional and knowing homicide where mitigated.

The Revised Code departs from both the Model Penal Code and the Tentative Draft in retaining two degrees of murder. Intentional murder (and inducing suicide) is first degree murder, AS 11.41.100, while homicide resulting from an intent to cause serious physical injury or knowledge that the actor's conduct is substantially certain to cause death or serious physical injury is second degree murder, AS 11.41.110(a)(1). Felony murder is carried over from the Tentative Draft into the Revised Code but

reduced to second degree murder, AS 11.-41.110(a)(3).

In addition, the Revised Code contains, with some modifications, the reckless murder provision currently under consideration. The Model Penal Code states that, subject to mitigation to manslaughter, "criminal homicide constitutes murder when [*inter alia*] it is committed recklessly under circumstances manifesting extreme indifference to the value of human life . . . ." Model Penal Code § 210.2(1)(b). The Tentative Draft states that: "A person commits the crime of murder if . . . he recklessly causes the death of another person under circumstances manifesting an extreme indifference to the value of human life . . . ." Tentative Draft 11.41.110.(a)(2). Finally, the Revised Code states: "A person commits the crime of murder in the second degree if . . . he intentionally performs an act that results in the death of another person under circumstances manifesting an extreme indifference to the value of human life . . . ." AS 11.41.110(a)(2).

Neitzel and the state both note the slight variation in language between the Model Penal Code and the Tentative Draft on the one hand and the Revised Code on the other. They infer substantial differences in legislative meaning.

Neitzel argues that the legislature intended to require a specific intent to do the act evidencing a "man-endangering-state-of-mind," such as shooting at Ms. Reedy, and that intoxication is relevant to negate this intent. The state counters that the intent mentioned in the murder statute refers to conduct, not to the result, rendering the statutory definition inapplicable. The state further argues that the legislature, in deleting a reference to recklessness regarding the surrounding circumstances, *i.e.,* the presence of Ms. Reedy and her vulnerability, wished an objective standard similar to negligence rather than a recklessness standard to apply to these circumstances.

The state relies primarily on the 1980 amendments to AS 11.81.600 which eliminate the requirement that a culpable mental state must be proved "with respect to each element of the offense" and the requirement that a legislative intent to dispense with a culpable mental state "clearly appear." The legislative history indicates that the legislature expected that most statutes would only require one mental state and that the courts should consider legislative history in determining the meaning of statutes whether the statutes themselves are clear or not. We note, however, that these amendments came two years after enactment of AS 11.41.110(a)(2) which establishes the elements of reckless murder, and consequently cannot be viewed as establishing the legislature's intent in 1978 when the code was originally adopted. *Wright v. State,* 651 P.2d 846 (Alaska App. 1982).

■ While the positions of the parties are forcefully argued, we reject both. In so doing, we recognize that among the advantages of adopting a Model Penal Code provision is recourse to the commentary which accompanies it. The commentary is frequently an invaluable aid in statutory construction. Further, where identical statutes are adopted in a number of jurisdictions, judicial decisions in each jurisdiction are available to all, and where a common interpretation is given identical statutes, the public interest in certainty and predictability in the laws is advanced. Where, as here, minor modifications are made in the language of a model act, the parties understandably assume that the legislature intended major modifications in meaning. In the instant case, we find that assumption to be unsound and conclude that the legislature intended AS 11.41.110(a)(2) to have the same meaning as Model Penal Code § 210.-2(b). In our view, the difference in terminology, *i.e.,* substituting "intentionally" for "recklessly" resulted from an attempt to consistently apply other changes which the legislature made in the scope of such Model Penal Code terms as "intentionally," "knowingly," and "recklessly." As we interpret it, AS 11.41.110(a)(2) requires that the actor must knowingly engage in conduct causing the death of another which in light of the circumstances is reckless to the

point that it manifests an extreme indifference to the value of human life. This is what we understand Model Penal Code § 210.2(1)(b) to mean as well.

We believe the Senate comment to this section, which we will discuss momentarily, viewed in the light of other sections of the Revised Code, compels this conclusion. As mentioned before, the Model Penal Code, the Tentative Draft, and the Revised Code divide elements of offenses into three categories: conduct, surrounding circumstances, and results. Applying this structure to AS 11.41.110(a)(2) we find:

1. *Conduct:* performing an act.

2. *Surrounding Circumstances:* under circumstances manifesting an extreme indifference to the value of human life.

3. *Result:* the death of another person.

It is to these elements that we must apply the culpable mental states described in the code. As we do so, we must bear in mind that the legislature, in enacting the Revised Code, departed from the Model Penal Code and the Tentative Draft in narrowing the scope of those culpable mental states. Thus, "intentionally" applies only to results, AS 11.81.900(a)(1), "knowingly" applies only to conduct and circumstances, AS 11.81.900(a)(2), and "recklessly" applies only to results and circumstances, AS 11.-81.900(a)(3). *See* 2 Senate Journal Supplement No. 44, at 28 (May 29, 1980). Further, AS 11.81.610(b) provides:

> Except as provided in AS 11.81.600(b) [relating to violations and strict liability offenses], if a provision of law defining an offense does not prescribe a culpable mental state, the culpable mental state that must be proved with respect to
> (1) conduct is "knowingly"; and

(2) a circumstance or a result is "recklessly."

In light of these provisions, the legislative comment to AS 11.41.110(a)(2) becomes clear:

> Subsection (a)(2) describes conduct that is very similar to the "substantially certain" clause in subsection (a)(1). Under this provision, however, the defendant need not necessarily know that his conduct is substantially certain to cause death or serious physical injury. An example of conduct covered by this provision would be shooting through a tent under circumstances where the defendant did not know a person was inside or persuading a person to play "russian [sic] roulette". The defendant is only required to intent to perform the act; there is no requirement that he intend to cause death or that he know that his conduct is substantially certain to cause death.

2 Senate Journal Supplement No. 47, at 10 (June 12, 1978).

■ The Tentative Draft allowed "intentionally" to govern conduct as well as results. The Revised Code confines "intentionally" to results leaving conduct to be governed by "knowingly." Apparently overlooking this change in the scope of the culpable mental states, the legislature used the word "intentionally" in AS 11.41.-110(a)(2) to govern conduct, *i.e.,* performing the act, when by the definitions adopted by the legislature only "knowingly" can govern conduct.[2] The comment makes it clear that "recklessness" rather than knowledge or intent was to govern the "surrounding circumstances" and "the result." No mental element is specifically established for the result ("death") and the surrounding circumstances ("under circumstances mani-

---

**2.** The Tentative Draft provided:
   (a) For purposes of this title, unless the context otherwise requires,
   (1) a person acts "intentionally" with respect to a result or to conduct described by a provision of law defining an offense when his conscious objective is to cause that result or to engage in the conduct . . . .
Tentative Draft 11.11.140.

This provision was based on New York Penal Code § 15.05(1) (1965). The reference to "intentionally" with respect to conduct was deleted when the Revised Code was enacted. *See* AS 11.81.900(a)(1). Thus, AS 11.81.900(a)(1) is distinguishable from the statutes which permit "intentionally" to govern conduct. *See People ex rel. Russel v. District Court,* 521 P.2d 1254, 1256–57 (Colo.1974) (analyzing Colorado Revised Statute 40–3–102(1)(d) (1963)).

festing extreme indifference to the value of human life") in AS 11.41.110(a)(2). Consequently, "recklessly" governs those elements. It is clear that if Neitzel fired at Ms. Reedy intending her death and killed her, he would be guilty of first degree murder, not second degree murder. *See* AS 11.41.100(a)(1). The victim's death is the only result mentioned in AS 11.41.110(a)(2). In conclusion, applying the statutory terminology as defined in the code, to be guilty of second degree murder Neitzel had to know he was firing a gun and be reckless regarding: (1) the circumstances, *i.e.,* the location of Ms. Reedy, her vulnerability, and the direction in which he was shooting; and (2) the result, *i.e.,* her death. Under the Revised Code, intoxication is not relevant in evaluating the culpable mental states of "knowingly," AS 11.81.900(a)(2), or "recklessly," AS 11.81.900(a)(3).

The state concedes that the word "intentionally" modifies conduct and not a result. It nevertheless argues that silence regarding the surrounding circumstances should be construed to establish either strict liability or an objective test similar to criminal negligence. We reject this argument. The Model Penal Code provides in substance that if one mental element is provided for an offense, it applies to all the material elements of the offense in the absence of a contrary purpose. *See* Model Penal Code § 2.02(4). This provision was carried over in the Tentative Draft and the Revised Code (*see* AS 11.81.610(a)), but was repealed in 1980. *See supra* note 1.

■ AS 11.81.600(b) specifies that strict liability must be expressly designated. Further, in the commentary to AS 11.81.-610, the drafters stated:

> Under subsection (b), if a statute does not specify any culpable mental state, conduct is required to be engaged in "knowingly" and results and circumstances are required to be engaged in "recklessly." "Criminal negligence" will not apply unless the term is expressly included in the statute defining the offense.

2 Senate Journal Supplement No. 47, at 144 (June 12, 1978). Under these circumstances, we conclude that "recklessly" governs the surrounding circumstances and the result in reckless murder.

In addition to his statutory construction arguments, Neitzel objects to this analysis on two grounds. First, he contends that holding an intoxicated person to the same standard as a sober person deprives the intoxicated person of due process of law. He relies upon *Kimoktoak v. State,* 584 P.2d 25, 33–35 (Alaska 1978). Secondly, he contends that reckless murder is insufficiently distinguished from reckless manslaughter so that his conviction deprives him of the equal protection of the law. He relies, *inter alia,* on *Keith v. State,* 612 P.2d 977, 986 n. 31 (Alaska 1980).

*Kimoktoak* is inapposite. There the court interpreted former AS 11.70.030 to permit evidence of intoxication to negate knowledge where knowledge was an element of an offense. The court relied on cases from California similarly interpreting California Penal Code § 22, which at that time was identical to former AS 11.70.030. The court did not base its holding on the constitution. Current Alaska law expressly precludes this result with regard to offenses established in the Revised Code. *See* AS 11.81.630, .640 and .900(a)(2).

■ Neitzel does not dispute his ability to know he was firing a gun. The focus of his due process attack is on the claim that he recklessly disregarded the surrounding circumstances. In this regard, the Revised Code follows the Model Penal Code in precluding evidence of intoxication on the issue of recklessness. *See* Model Penal Code § 2.08(2). We do not consider the legislative judgment to preclude consideration of intoxication in determining recklessness so irrational that it violates due process. *Cf. Morgan v. Municipality of Anchorage,* 643 P.2d 691, 692 (Alaska App.1982) (city need not prove that person prosecuted for driving while intoxicated knew his driving was impaired). The commentary to the Model Penal Code sets out the arguments for considering intoxication on the issue of recklessness and then explains its reasons for rejecting those arguments as follows:

The case thus made is worthy of respect, but there are strong considerations on the other side. We mention first the weight of the prevailing law which here, more clearly than in England, has tended towards a special rule for drunkenness. Beyond this, there is the fundamental point that awareness of the potential consequences of excessive drinking on the capacity of human beings to gauge the risks incident to their conduct is by now so dispersed in our culture that we believe it fair to postulate a general equivalence between the risks created by the conduct of the drunken actor and the risks created by his conduct in becoming drunk. Becoming so drunk as to destroy temporarily the actor's powers of perception and of judgment is conduct which plainly has no affirmative social value to counterbalance the potential danger. The actor's moral culpability lies in engaging in such conduct. Added to this are the impressive difficulties posed in litigating the foresight of any particular actor at the time when he imbibes and the relative rarity of cases where intoxication really does engender unawareness as distinguished from imprudence. These considerations lead us to propose, on balance, that the Code declare that unawareness of a risk of which the actor would have been aware had he been sober be declared immaterial.

A.L.I. Model Penal Code, Tentative Draft No. 9 § 2.08 at 8–9 (1959). We find these considerations persuasive. *Accord State v. Ramos,* 648 P.2d 119, 120–22 (Ariz.1982); *People v. LeGrand,* 61 A.D.2d 815, 402 N.Y. S.2d 209, 211, *cert. denied,* 439 U.S. 835, 99 S.Ct. 117, 58 L.Ed.2d 130 (1978).

Neitzel's equal protection argument is also unfounded. Neitzel argues that reckless murder, as we define it, is conceptually indistinguishable from reckless manslaughter. *See* B. Gegan, *A Case of Depraved Mind Murder,* 49 St. John's L.Rev. 417, 440–50 (1974) (criticizing the comparable New York statute on this ground). If intoxication is held to be a defense to murder but not manslaughter, Neitzel concludes the two offenses are kept separate and the equal protection problem disappears.

■ We reject this argument because even without allowing intoxication as a defense to murder, the two offenses are sufficiently distinct to avoid equal protection problems. The Revised Code simply follows the Model Penal Code in distinguishing reckless murder from reckless manslaughter. The drafters of the Model Penal Code suggest the following reasons:

Section 210.2(1)(b) also provides that criminal homicide constitutes murder when it is "committed recklessly under circumstances manifesting extreme indifference to the value of human life." This provision reflects the judgment that there is a kind of reckless homicide that cannot fairly be distinguished in grading terms from homicides committed purposely or knowingly.

Recklessness, as defined in Section 2.02(2)(c), presupposes an awareness of the creation of substantial homicidal risk, a risk too great to be deemed justifiable by any valid purpose that the actor's conduct serves. Since risk, however, is a matter of degree and the motives for risk creation may be infinite in variation, some formula is needed to identify the case where recklessness may be found and where it should be assimilated to purpose or knowledge for purposes of grading. Under the Model Code, this judgment must be made in terms of whether the actor's conscious disregard of the risk, given the circumstances of the case, so far departs from acceptable behavior that it constitutes a "gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." Ordinary recklessness in this sense is made sufficient for a conviction of manslaughter under Section 210.3(1)(a). In a prosecution for murder, however, the Code calls for the further judgment whether the actor's conscious disregard of the risk, under the circumstances, manifests extreme indifference to the value of human life. The significance of purpose or knowledge as a standard of culpability is that, cases of provo-

cation or other mitigation apart, purposeful or knowing homicide demonstrates precisely such indifference to the value of human life. Whether recklessness is so extreme that it demonstrates similar indifference is not a question, it is submitted, that can be further clarified. It must be left directly to the trier of fact under instructions which make it clear that recklessness that can fairly be assimilated to purpose or knowledge should be treated as murder and that less extreme recklessness should be punished as manslaughter.

Insofar as Subsection (1)(b) includes within the murder category cases of homicide caused by extreme recklessness, though without purpose to kill, it reflects both the common law and much pre-existing statutory treatment usually cast in terms of conduct evidencing a "depraved heart regardless of human life" or some similar words. Examples usually given include shooting into a crowd or into an occupied house or automobile, though they are not, of course, exhaustive.

Some indication of the content of this concept as a means of differentiating murder and manslaughter may be afforded by prior decisional law. One case involved a game of Russian roulette, where the defendant pointed a revolver loaded with a single cartridge at his friend. The weapon fired on the third try, and the fatal wound resulted. The court affirmed the conviction for murder, despite ample evidence that the defendant had not desired to kill his friend, with the statement that "malice in the sense of a wicked disposition is evidenced by the intentional doing of an uncalled-for act in callous disregard of its likely harmful effects on others." In another case, the defendant's claimed intention was to shoot over his victim's head in order to scare him. The court held that, even crediting this assertion, the jury could find the defendant guilty of murder on the ground that his act showed "such a reckless disregard for human life as was the equivalent of a specific intent to kill." A third illustration involved a defendant who fired several shots into a house which he knew to be occupied by several persons. The court affirmed his conviction of murder because the defendant's conduct was "imminently dangerous" and "evinced a wicked and depraved mind regardless of human life." Other acts held to show sufficient recklessness to justify a conviction of murder include shooting into a moving automobile and throwing a heavy beer glass at a woman carrying a lighted oil lamp. The Model Code formulation would permit a jury to reach the same conclusion in each of these cases.

A.L.I., *Model Penal Code and Commentaries,* Part II § 210.2, at 21–23 (1980) (footnotes omitted). The commentator concludes:

Given the Model Code definition of recklessness, the point involved is put adequately and succinctly by asking whether the recklessness rises to the level of "extreme indifference to the value of human life." As has been observed, it seems undesirable to suggest a more specific formulation. The variations referred to above [various formulations from modern codes discussed in the commentary] retain in some instances greater fidelity to the common-law phrasing but they do so at great cost in clarity. Equally obscure are the several attempts to depart from the common law to which reference has been made. The result of these formulations is that the method of defining reckless murder is impaired in its primary purpose of communicating to jurors in ordinary language the task expected of them. The virtue of the Model Penal Code language is that it is a simpler and more direct method by which this function can be performed.

*Id.* at 25–26 (footnotes omitted).

In conclusion, jurors asked to evaluate conduct resulting in death to determine whether it was negligent, reckless or malicious must weigh four factors:

(1) The social utility of the actor's conduct,

(2) the magnitude of the risk his conduct creates including both the nature of forseeable harm and the likelihood that the conduct will result in that harm;

(3) the actor's knowledge of the risk; and

(4) any precautions the actor · takes to minimize the risk.

See G. Fletcher, *Rethinking Criminal Law* § 4.3, at 259–62 (1978) (Homicide by Excessive Risk Taking); W. LaFave and A. Scott, *Handbook on Criminal Law* § 70, at 541–45 (1972) (Depraved-Heart Murder). Under the Revised Code, negligent homicide and reckless manslaughter are satisfied by conduct creating a significant risk of death absent justification or excuse. They differ only in the actor's knowledge of the risk. In differentiating reckless murder from reckless manslaughter, the jury is asked to determine whether the recklessness manifests an extreme indifference to human life. In so doing, it might pay particular attention to the social utility of the defendant's conduct and the precautions he takes to minimize the apparent risks. In evaluating the social utility of the actor's conduct, the jury must of course consider defenses such as provocation, necessity, the defense of self and of others, if supported by the evidence. Shooting at someone, by itself, is devoid of social utility and consequently has been used by the commentators as the paradigm of extreme indifference to human life. Where, however, a gun is fired at an attacking lion in an attempt to rescue the victim and the bullet strikes the victim, the social utility of the conduct may excuse it despite the magnitude of the risk. *Cf. Lee v. State,* 490 P.2d 1206 (Alaska 1971) (a civil case where the victim was shot in the course of her rescue from a lioness; jury absolved defendant of gross negligence, case remanded for trial for ordinary negligence), *overruled on other grounds, Munroe v. City Council,* 545 P.2d 165, 170 n. 11, *modified on rehearing,* 547 P.2d 839 (Alaska 1976).

In addition, the jury may evaluate any precautions taken. Thus, a person may be reckless in the sense that he knowingly engages in conduct which creates a forseeable risk of death and amounts to a gross deviation from the standard of conduct that a reasonable person would observe in the sense that the social utility of his conduct does not warrant exposing another to the risk of death. He may, however, still not manifest an extreme indifference to the life of the person endangered if he takes substantial precautions to minimize the risk.

Finally, and most importantly, the jury must consider the nature and gravity of the risk, including the harm to be foreseen and the likelihood that it will occur. For both murder and manslaughter, the harm to be foreseen is a death. Therefore, the significant distinction is in the likelihood that a death will result from the defendant's act. Where the defendant's act has limited social utility, a very slight though significant and avoidable risk of death may make him guilty of manslaughter if his act causes death. Driving an automobile has some social utility although substantially reduced when the driver is intoxicated. The odds that a legally intoxicated person driving home after the bars close will hit and kill or seriously injure someone may be as low as one chance in a thousand and still qualify for manslaughter. Where murder is charged, however, an act must create a much greater risk that death or serious physical injury will result. This is the point, in the Model Penal Code commentary "that recklessness … can fairly be assimilated to purpose or knowledge …."

How likely death must be before murder can be charged is not susceptible to mathematical demonstration. An examination of the classic example given to distinguish murder from manslaughter—Russian roulette—gives some guidance. If a revolver had six chambers in its cylinder and only one contains a bullet and we assume no imperfection in the revolver, then the odds are one in six that a bullet will fall under the hammer when the cylinder is spun and the trigger is pulled. Stated otherwise a participant has a 16.7% chance of being killed or seriously injured and an 83.3% chance of not being killed or seriously injured in a game of Russian Roulette each

time he puts the gun to his temple and pulls the trigger. The act is so dangerous and so lacking in social utility, however, that it demonstrates extreme indifference to human life and serves to distinguish murder from manslaughter.

The commentary to the Model Penal Code suggests that all of these concepts are adequately conveyed to the jury in the single phrase "extreme indifference to the value of human life." We therefore hold that the Revised Code sufficiently distinguishes between reckless murder and reckless manslaughter to satisfy equal protection.[3]

■ The trial court instructed the jury on second degree murder, manslaughter and negligent homicide. The jury was specifically informed that manslaughter and negligent homicide were lesser included offenses of second degree murder. The court defined recklessness for the jury. It did not tell the jury that murder was a strict liability offense or that negligence regarding the surrounding circumstances was sufficient to establish murder. While the parties debated distinctions between "objective" and "subjective" theories of extreme indifference murder out of the jury's presence in their arguments to the court regard-ing jury instructions, it does not appear that the instructions actually given the jury differed materially from what we find to be the controlling law. To the extent that the Revised Code would authorize additional instructions differentiating murder from manslaughter in terms of the social utility of Neitzel's conduct measured against the gravity of the risk that Neitzel's conduct presented to Ms. Reedy, a question we do not decide, no such instructions were requested. Neitzel would be hard-put to argue that his conduct had any social utility; his conduct closely approximates the examples frequently used in the common law and in the Model Penal Code to differentiate reckless murder from manslaughter.[4] While we hold that recklessness regarding the consequences was the required culpable mental state for reckless murder, we conclude that the instructions given adequately conveyed that idea to the jury. We find no evidence other than that relating to intoxication which would support an instruction on diminished capacity and, as we have seen, intoxication cannot be considered by the jury in determining the culpable mental states of "knowingly" and "recklessly" under the Revised Code. We therefore conclude that any error in the instructions was

---

**3.** Our decision is therefore compatible with *People v. Jones,* 193 Colo. 250, 565 P.2d 1333 (Colo.), *appeal dismissed,* 434 U.S. 962, 98 S.Ct. 498, 54 L.Ed.2d 447 (1977), and *People v. Poplis,* 30 N.Y.2d 85, 330 N.Y.S.2d 365, 281 N.E.2d 167 (1972), which distinguish reckless murder from reckless manslaughter under similar statutes thereby avoiding an equal protection challenge. *People v. Marcy,* 628 P.2d 69, 78–79 (Colo.1981), would support an argument that knowingly engaging in conduct "under circumstances manifesting an extreme indifference to the value of human life," AS 11.41.-110(a)(2), is virtually indistinguishable from "knowing that his conduct is substantially certain to cause death or serious physical injury to another person," AS 11.41.110(a)(1). Neitzel does not make this argument and it would do him no good if he did since both subsections constitute second degree murder and intoxication would not be relevant to preclude a finding of the relevant mental state under either. Consequently, we *do not decide whether AS* 11.41.-110(a)(2) reaches conduct which AS 11.41.-110(a)(1) does not. We note however that a game of Russian roulette is not substantially certain to cause death or serious physical inju-ry and the legislative report clearly views the two subsections as similar but distinct. *See* 2 Senate Journal Supplement No. 47, at 9–10 (June 12, 1978) (legislative commentary on AS 11.41.110(a)(2)).

Finally, we note that Neitzel does not argue that "extreme indifference" requires more than one potential victim and therefore we do not reach that issue. *See People v. Jones,* 193 Colo. 250, 565 P.2d 1333, *appeal dismissed,* 434 U.S. 962, 98 S.Ct. 498, 54 L.Ed.2d 447 (1977).

**4.** The common way to distinguish between two related concepts is to give examples. Most of the examples customarily given of conduct which exhibits "extreme indifference to human life" so closely parallel Neitzel's conduct that they would have been more favorable to the state than the instructions actually given. The United States Supreme Court for this reason rejected a demand for greater clarification on the issue of causation in connection with a prosecution under the similar New York statute. *See Henderson v. Kibbe,* 431 U.S. 145, 156 n. 16, 97 S.Ct. 1730, 1738 n. 16, 52 L.Ed.2d 203, 214 n. 16 (1977).

harmless beyond reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710 (1967).

The judgment of the superior court is AFFIRMED.[5]

---

5. We recognize that the state obtained a protective order against testimony of "diminished capacity" and that Neitzel in his discussions with the court mentioned that he had suffered prior head injuries, alcohol blackouts, and had been treated for mental illness. The record reflects however that the defense explored the possibility of an insanity defense and one based on involuntary intoxication and rejected them. Neitzel's argument to the trial court and to this court has been phrased in terms of intoxication as the factor which established his diminished capacity. When the issue of Post-Traumatic Syndrome was broached by Neitzel, the court indicated that it did not understand what evidence Neitzel intended to offer and Neitzel did not elaborate further. Under these circumstances we cannot find that Neitzel has sustained the burden he bears, under Alaska Rule of Evidence 103(b), of offering evidence which, if believed, would raise a reasonable doubt whether Neitzel's mental health was such that even if sober he would not have appreciated the risk his conduct posed to Ms. Reedy.

Our disposition of this appeal would not, however, preclude Neitzel from bringing a motion pursuant to Criminal Rule 35(c) and attempting to show that he was in possession of evidence of diminished capacity unrelated to intoxication, but failed to offer it in reasonable reliance on the trial court's prior rulings. Such a showing might warrant a new trial.