**Guy Jerome NORRIS, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–3887.

Court of Appeals of Alaska.

July 30, 1993.

---

Susan Downie, Asst. Public Defender, Fairbanks, and John B. Salemi, Public Defender, Anchorage, for appellant.

Richard W. Maki, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

### OPINION

MANNHEIMER, Judge.

Guy Jerome Norris appeals his conviction for second-degree murder, AS 11.41.-110(a)(2). We affirm.

On the afternoon of May 8, 1989, Guy Norris and his live-in companion Lisa Booth were drinking at their home in Port Alice with some friends, Tim Elliott, Shawn Nieme, and Jim Sanford. Nieme and Sanford left the home a little after 4:00 p.m. Norris and Elliott proceeded to drink "a good portion" of a half-gallon bottle of whiskey, and then started looking for more.

Lisa Booth had hidden two pint bottles of Everclear under a chair, intending to save

them to celebrate her birthday the next day. Elliott, however, disclosed the location of the Everclear to Norris. Norris pulled out one of the pints and started drinking from it.

When Booth realized that Norris had raided her liquor, she became angry and punched Elliott in the face, causing his nose to bleed. When Elliott was about to hit Booth, Norris told him, "Go ahead. Kick her ass." Elliott, however, did not strike Booth.

Norris and Booth began arguing. Booth started throwing household knickknacks, but nothing more dangerous than a clam shell. Elliott continued to sit on a couch, without fear for his safety.

Norris attempted to restrain Booth, but every time he released her she began to throw things again. Norris then picked up a 30–30 Winchester lever-action rifle. He fired a shot into the ceiling and a second shot into the wall. Because the Winchester had a lever action, Norris was required to manually work the lever down and back to feed a new round into the chamber each time he shot the rifle.

Norris and Booth were both on their feet, as if they were going to fight. Norris, still holding the rifle, swung around and hit Booth in the eye with the butt of the weapon. Booth landed in the corner, but got to her feet again. When she and Norris resumed their struggle, Norris threw her to the ground. (Norris is 6'2" and weighed 200 pounds; Booth was 5'5½" and weighed 140 pounds.)

As Booth lay on her back, Norris stood over her with one foot on either side of her waist. Norris was still holding the rifle, with a round chambered and his finger on the trigger. Holding the rifle so that it pointed toward Booth's head, Norris twice asked angrily, "Is this what you fucking want?" Then Elliott, who was still sitting on the couch a few feet away, heard a shot

ring out. Booth died within seconds from a gunshot wound through her neck.

After shooting Booth, Norris sat down in a chair. He shook Booth's limp leg and declared, "The fucking bitch won't give me no more problems."

Elliott left the house to call the police, then he returned with Sanford. When Sanford retrieved Norris's Winchester, he found that a new round had been levered into the chamber.

A Ketchikan grand jury indicted Norris for first-degree murder, AS 11.41.-100(a)(1)(A). At trial, Norris was acquitted of this charge but convicted of the lesser included offense of second-degree murder.[1]

■ Norris's first argument on appeal concerns an evidentiary ruling at his trial. Norris asked the trial judge to allow him to introduce evidence of Booth's reputation for violence and mental instability, arguing that this evidence would help establish a claim of self-defense or, alternatively, would demonstrate that Booth was reckless and unstable, a person likely to grab the barrel of the rifle, causing it to discharge accidentally.

Superior Court Judge Thomas E. Schulz refused to allow Norris to introduce evidence of Booth's reputation for violence until the defense had presented some evidence of self-defense. Under questioning by Judge Schultz, Norris's attorney revealed that, although Norris planned to testify that Booth had grabbed the rifle, thus causing it to discharge unintentionally, the defense had no evidence indicating that Booth had had access to a weapon or had otherwise posed an immediate threat of harm to Norris. In light of these answers, Judge Schultz ruled that, though Norris was free to testify about what happened and why he did what he did, no evidence supported a claim of self-defense and, thus, the proposed evidence of Booth's reputation for violence was inadmissible.

---

1. The case was presented to the jury under two theories of second-degree murder: subsection (a)(1) conduct that the defendant intends to cause serious physical injury or knows is substantially certain to cause death or serious phys-ical injury; and subsection (a)(2) conduct manifesting extreme indifference to the value of human life. The jury found Norris guilty under the second theory.

On appeal, Norris implicitly concedes that he presented no evidence of self-defense.[2] However, Norris argues that Booth's reputation for violence was relevant in other ways. Specifically, Norris argues that he armed himself with the rifle because he knew that Booth could be violent and he feared that Booth might attack him with a weapon. Norris asserts that the jury had to determine whether his act of arming himself was reasonable, and he further asserts that evidence of Booth's character for violence would have helped the jury make this determination.

We reject Norris's argument. Assuming that Norris's fear of Booth's potential for violence motivated him to pick up the Winchester in the first place, Norris was not convicted for the mere act of arming himself. Norris not only picked up the rifle, but he hit Booth in the head with it, then knocked her down again, straddled her, and pointed the barrel toward her head as she lay prostrate. At this point, the rifle discharged, killing Booth. Given this progress of events, the reasonableness of Norris's initial decision to pick up the rifle had essentially no bearing on Norris's guilt of second-degree murder. Whatever Booth's reputation might have been, and however it might have affected Norris's decision to pick up the rifle, that reputation would not affect the reasonableness of Norris's act of threatening an unarmed and helpless person with a loaded firearm when he feared no immediate danger from her.

Moreover, the record of Norris's trial shows that Norris succeeded in presenting this evidence to the trial jury despite Judge Schulz's ruling. The testimony at the trial is replete with evidence that Booth was prone to violent outbursts. Tim Elliott testified that, on the night of Booth's death, she hit Elliott with her fist and caused his nose to bleed. Norris testified that, less than a month before her death, Booth had stabbed him with a knife during an argument. According to Norris's testimony, Booth had attempted to stab his chest, but

Norris had fended off the blow, receiving instead a wound to his wrist that left a scar. Norris also testified that, on the night of Booth's death, Shawn Nieme had asked to borrow Norris's truck and rifle to go hunting. Booth began screaming, tried to grab the rifle, then ran out of the house to take the keys out of the truck. Later in the evening, when Norris tried to restrain Booth from throwing things, Booth hit Norris in the mouth, cutting his lip. A photograph of Norris's injured lip was introduced at trial. Norris also testified that Booth pulled out a portion of Norris's beard during their final altercation and told him, while he stood over her with the rifle, that she would kill him in his sleep with a knife.

In sum, the jury heard evidence clearly indicating that Booth was not a timid or retiring person. Moreover, because this testimony was not confined to Booth's reputation but instead delved into numerous specific acts of violence, it exceeded the scope of evidence that would have been admissible under Alaska Evidence Rules 404(a) and 405 if Judge Schulz had ruled in Norris's favor. Evidence of Booth's reputation for violence would have added nothing to Norris's case. We uphold the trial court's ruling.

Norris next challenges several of the trial court's jury instructions.

■ Norris asserts that the trial judge failed to give the jury an adequate explanation of "proximate cause". We have reviewed the trial court's instructions and find them adequate. In any event, Norris's case does not present a proximate cause issue. Even viewed in the light most favorable to the defense, the evidence shows that Norris knocked Booth to the ground and stood over her, armed with a rifle. If, as Norris testified, the rifle discharged because Booth grabbed it and attempted to pull it from his grasp, Norris's conduct would still be a "substantial factor" in causing Booth's death. *See State v. Malone*, 819 P.2d 34, 36 (Alaska App.1991). A

**2.** Indeed, Norris testified at trial that he hit Booth with the rifle simply because he was "sick of her breaking everything."

victim's attempt to disarm an assailant presents a classic example of unbroken proximate cause:

> [A]ny response of a human being to harm or threat of harm is a consequence of whatever [conduct] produced [the] harm or threat, and insofar as the response is a normal one this actual causation is recognized by law. Hence an act resulting in harm or threat of harm is the proximate cause of further harm caused by [a] response thereto....
>
> If, in the effort to save himself from apparent death or great bodily injury, one grabs a firearm which has suddenly been pointed at him, and the force thus exerted by him causes a fatal discharge not intended by the pointer, the act of pointing the weapon has caused the death.

R. Perkins & R. Boyce, *Criminal Law* (3rd ed. 1982), pp. 794–95 (footnote omitted).

■ Norris next contends that the trial court's instruction on the elements of second-degree murder allowed the jury to convict him without unanimously agreeing on the criminal conduct Norris had committed. The challenged instruction told the jurors that, to convict Norris of second-degree murder, they had to unanimously agree:

> that [Norris] knowingly engaged in conduct under circumstances manifesting an extreme indifference to the value of human life; and
>
> ... [that Norris's] act or conduct caused the death of Lisa Booth.

Norris asserts that this instruction could have led to a non-unanimous verdict because jurors having different views of the facts could join in voting for Norris's conviction of second-degree murder. According to Norris, some jurors may have believed his testimony that the rifle discharged accidentally when Booth grabbed it, but they still could have viewed Norris's act of threatening Booth with a loaded rifle as conduct manifesting an extreme indifference to the value of human life; other jurors could have rejected Norris's testimony, concluding that Norris acted with extreme indifference to the value of human

life because he knowingly pulled the trigger and shot Booth.

Norris's argument misapprehends the nature of the unanimity requirement. In *State v. James*, 698 P.2d 1161, 1165 (Alaska 1985), the Alaska Supreme Court adopted the rule on jury unanimity announced in *People v. Sullivan*, 173 N.Y. 122, 65 N.E. 989 (1903). In *Sullivan*, the defendant was charged with first-degree murder under alternative theories: that the killing was premeditated, or that the killing was unintentional but occurred while the defendant was perpetrating a felony. The jury was not called upon to specify which theory of first-degree murder they thought proved. On appeal, the defendant asserted that the jury's use of a general verdict violated his right to jury unanimity. The New York Court of Appeals disagreed:

> It is not necessary that a jury, in order to find a verdict, should concur in a single view of the transaction disclosed by the evidence. If the [jury's] conclusion may be justified upon either of two interpretations of the evidence, the verdict cannot be impeached by showing that a part of the jury proceeded upon one interpretation and part upon the other. So, in this case, it was not necessary that all the jurors should agree ... that there was a deliberate and premeditated design to take the life of the deceased, or in the conclusion that the defendant was at the time engaged in the commission of a felony, or an attempt to commit one. *It was sufficient that each juror was convinced beyond a reasonable doubt that the defendant had committed the crime of murder in the first degree as that offense is defined by the statute.*

*People v. Sullivan*, 65 N.E. at 989–990 (emphasis added) (citation omitted), *quoted in State v. James*, 698 P.2d at 1164.

Similarly, in *State v. Arndt*, 87 Wash.2d 374, 553 P.2d 1328 (1976), another case quoted with approval in *James*, the Washington Supreme Court upheld a conviction for larceny (by fraud) over an assertion that the verdict had not been unanimous. The jury had been instructed that the defendant could be convicted if she:

either made a false statement [concerning the] circumstances affecting her eligibility [or] need for [public] assistance, or ... failed to reveal any material ... circumstances affecting her eligibility [or] need for assistance, or ... failed to promptly notify the county ... of any change in [her income.]

*Arndt*, 553 P.2d at 1329, *quoted in James*, 698 P.2d at 1165. The Washington court held that, while jurors must unanimously agree that the defendant is guilty of the crime charged, "it is unnecessary ... that there be ... unanimity as to the means by which the crime is committed[,] provided there is substantial evidence to support each of the means charged." *Arndt*, 553 P.2d at 1330, *quoted in James*, 698 P.2d at 1165.

■ Thus, contrary to Norris's argument, jurors need not agree on a single interpretation of the evidence. They may reach differing conclusions as to what exactly was said or done during a particular episode, so long as they are all convinced that the defendant's conduct and culpable mental state(s) during that episode satisfy the elements of the crime. See *State v. Handran*, 113 Wash.2d 11, 775 P.2d 453, 456–57 (1989), in which the court held that it made no difference whether the jury believed that the defendant had kissed the victim without permission or had struck her, since both alleged acts of assault had occurred during the same, continuing course of conduct and each act independently constituted an assault.

In Norris's case, the jurors may indeed have been split on the issue of whether Norris intentionally fired the rifle into Booth's neck. However, even if some (or all) jurors believed that the rifle discharged accidentally when Norris stood over Booth and she grabbed the barrel, this interpretation of the evidence would still support the jury's verdict of second-degree murder.[3] The jury instruction satisfied the rule of

law adopted by the supreme court in *James*.

Norris argues that the second-degree murder instruction was broad enough to "encompass two separate incidents". We do not agree. In any case, the evidence presented at Norris's trial did not reveal two separate incidents. The murder charge against Norris was based on the incident that occurred at his and Booth's ·home on the afternoon of May 8, 1989. The trial evidence was unambiguously directed toward litigation of that event. Norris also argues that the instruction allowed the jurors to convict him even if they believed that the conduct manifesting Norris's extreme indifference to the value of human life was different from the conduct that caused Booth's death. Again, we disagree with Norris's interpretation of the instruction, and again we note that only one criminal episode was being litigated.

■ Norris's final attack on the second-degree murder instruction concerns the trial court's failure to explain that "extreme indifference to the value of human life" is a more culpable variant of recklessness. Norris did not raise this argument in the trial court. We therefore review the issue for plain error only. Alaska Criminal Rule 30(a); *Larson v. State*, 569 P.2d 783, 788 (Alaska 1977).

In *Neitzel v. State*, 655 P.2d 325, 332–33 (Alaska App.1982), this court construed AS 11.41.110(a)(2) to require proof that a defendant

knowingly engage[d] in conduct causing the death of another which[,] in light of the circumstances[,] is reckless to the point that it manifests an extreme indifference to the value of human life.

See also 655 P.2d at 337: "In differentiating reckless murder [i.e., second-degree murder under AS 11.41.110(a)(2) ] from reckless manslaughter, the jury is asked to determine whether the recklessness manifests an extreme indifference to the value

3. Compare *Christie v. State*, 580 P.2d 310, 320–22 (Alaska 1978), in which the defendant was charged under an assault statute requiring proof that the defendant had acted with either an intent to kill or an intent to wound. The su-

preme court upheld the defendant's conviction even though the jurors may have been split concerning whether the defendant acted with intent to kill or simply with intent to wound.

of human life." Norris argues that, without this clarification, the jurors might have failed to understand that they could not find Norris guilty of manifesting extreme indifference to the value of human life unless, at a minimum, they found that Norris either (1) had perceived and consciously disregarded a substantial and unjustifiable risk that his conduct would cause the death of another, or (2) had failed to perceive this risk because of intoxication. *See* AS 11.81.-900(a)(3) (defining "recklessly").

The State concedes that the second-degree murder instruction failed to inform the jurors of the relationship between "extreme indifference to the value of human life" and the lesser culpable mental state of "recklessness". However, the State contends that the jury instructions nevertheless apprised the jury of the requirement that Norris be subjectively aware of the risk to human life. In fact, the State argues, the jury instructions required the State to prove a higher culpable mental state than the law requires.

As noted above, the second-degree murder instruction told the jurors that they had to be convinced that Norris "knowingly engaged in conduct under circumstances manifesting an extreme indifference to the value of human life". From this phrasing, the State asserts, the jurors would have concluded that "knowingly" was the culpable mental state applicable to "circumstances manifesting an extreme indifference to the value of human life". The jurors were additionally told that "knowingly", when applied to a circumstance, required proof that the defendant "[was] aware that ... the circumstance exist[ed]". The State therefore concludes that, from the phrasing of the second-degree murder instruction and its juxtaposition with the instruction defining "knowingly", the jurors must have inferred that Norris could not be convicted of second-degree murder unless the State proved that Norris was aware, not simply that his conduct posed a substantial and unjustifiable risk to human life, but that his conduct manifested an extreme indifference to the value of human life.

The State's interpretation of the jury instructions carries considerable force. We additionally note that the manslaughter instruction implicitly informed the jury that second-degree murder required proof of greater culpability than recklessness. Under this instruction, Norris was to be convicted of manslaughter only if he recklessly killed another person "under circumstances not amounting to murder in the first or second degree". Finally, we note that the prosecuting attorney, in his summation to the jury, accurately apprised the jury of the relationship between "recklessness" and "extreme indifference to the value of human life":

> Now we get up into a higher standard, and now we start talking about ... the defendant engaging in conduct under circumstances manifesting an extreme indifference to the value of human life. Not just reckless[ness] any more, but now you've got to be reckless to the point of having extreme indifference to the value of human life.

The prosecutor's wording of the test closely matches this court's definition in *Neitzel.* The parties' arguments can cure defects or omissions in jury instructions. *O'Brannon v. State,* 812 P.2d 222, 229 (Alaska App. 1991). Thus, even if the jury did not interpret the instructions to require proof of "knowing" indifference to the value of human life, we find that the prosecutor's explanation of the relationship between recklessness and extreme indifference rectified the omission in the jury instructions.

For all these reasons, we conclude that the deficiency in the second-degree murder instruction does not amount to plain error.[4]

**4.** We note that Alaska's criminal pattern jury instructions (1989 edition) exacerbate the error present in Norris's case. As currently constituted, the pattern jury instructions suggest the following second-degree murder instruction when a defendant is charged under AS 11.41.-110(a)(2):

First, that the event in question occurred at or near [the named place] and on or about [the named date];

Second, [that] the defendant's conduct caused the death of [the deceased];

We turn now to Norris's sentencing arguments. Norris's offense, second-degree murder, is an unclassified felony that carries a minimum penalty of 5 years' imprisonment and a maximum penalty of 99 years' imprisonment. AS 11.41.110(b) and AS 12.55.125(b). In *Page v. State,* 657 P.2d 850, 855 (Alaska App.1983), this court established a benchmark sentencing range of 20 to 30 years for second-degree murder.

Judge Schulz sentenced Norris to 50 years' imprisonment. Norris contends that Judge Schulz failed to make any findings to justify this departure from *Page* 's benchmark sentencing range.

At sentencing, the prosecutor argued that, although unclassified felonies are not governed by presumptive sentencing, several aggravating factors listed in AS 12.55.-155(c) applied to Norris's case by analogy. Among these were: that Norris had a criminal history of aggravated or repeated instances of assaultive behavior, (c)(8) [5]; that Norris's offense was committed against a member of his social unit, (c)(18)(A); and that Norris's conduct was among the most serious included in the definition of second-degree murder, (c)(10). For his part, Norris asserted that two of the mitigators listed in AS 12.55.155(d) applied to his offense: that he had committed the offense under some degree of duress or coercion, (d)(3); and that Booth had provoked the crime to a significant degree, (d)(7).

While Judge Schulz did not make formal findings regarding these aggravators and mitigators, his sentencing remarks demonstrate that he agreed with the prosecutor about the aggravators and disagreed with Norris about the proposed mitigators. In the following passage, Judge Schulz rejected Norris's mitigators:

> [U]nder no set of facts that this court has been presented with … would [anything] have justified resort to a weapon in this case. To argue, as Mr. Norris has …, that Lisa [Booth's] prior conduct in breaking windows in the house or in throwing things at him, or even punching his friends, or him, somehow justified his picking up a 30–30 rifle, knocking her down to the floor, and subsequently shooting her, is ridiculous in my judgement. There isn't even a small scintilla of a self-defense argument there, or any

---

Third, that [the defendant] knowingly engaged in this conduct; and

Fourth, [that] the conduct was performed under circumstances manifesting an extreme indifference to the value of human life.

The pattern instructions contain no supplemental instruction on the definition of "extreme indifference to the value of human life", nor do they indicate in any other way that this culpable mental state is an aggravated form of recklessness. Thus, the jury might fail to understand that second-degree murder requires proof of either (1) the defendant's subjective awareness of the risk to human life or (2) the defendant's failure to perceive this risk because of intoxication.

Moreover, unlike the instruction given in Norris's case, the pattern second-degree murder instruction separates the phrase "knowingly engaged in conduct" from the phrase "under circumstances manifesting an extreme indifference to the value of human life". Thus, the pattern instruction loses the potential curative value of linking the culpable mental state "knowingly" with the "circumstances manifesting … extreme indifference".

We recommend that trial judges supplement the pattern instruction with a definition of "circumstances manifesting an extreme indifference to the value of human life" based on the discussion in *Neitzel,* 655 P.2d at 336–37.

5. In 1975, Norris was charged with second-degree assault in Washington for assaulting a police officer; he received a deferred disposition with probation for 5 years. In 1977, Norris's probation was revoked and he was sentenced to 10 years' imprisonment. In 1981, Norris was charged with third-degree criminal mischief and fourth-degree assault in Ketchikan. He was convicted of criminal mischief and a reduced charge of disorderly conduct. Norris had another disorderly conduct conviction in 1981, and two more in 1982. In 1985, Norris was convicted of third-degree misconduct involving weapons (carrying a concealed weapon).

Norris was also convicted of reckless endangerment in 1985 for firing a rifle in the home where he and Booth were living. When the police arrived, Norris asserted that there was no problem because he had fired the bullet into the ceiling. When the police officer suggested that Norris's actions had endangered the people living upstairs, Norris replied that he did not care because it was his house and he would do what he wanted. The officer then told Norris that he would have to seize the rifle; Norris responded by moving toward the rifle and telling the officer he was going to kill him.

other kind of justification. Nowhere in the evidence in this case, at the trial or now, did it ever appear that Lisa [Booth] had in her hand or even relatively close to her ... any kind of a dangerous weapon.

One of the men that she struck ... at the cabin that night testified at the trial. And my impression of his testimony was that he wasn't particularly bothered by the incident. So there just is no reason ... for the 30–30 to have ended up in Mr. Norris's hands.

Judge Schulz addressed aggravator (c)(18)(A) when he declared that Booth had been Norris's "wife, [or] certainly the functional equivalent of that; that was the nature of their relationship". Judge Schulz addressed aggravator (c)(8) when he stated that Norris's "[past] legal difficulties go back a long time", and that they "involve assaultive conduct [on] more than one occasion, including one prior felony." Finally, Judge Schulz implicitly found aggravator (c)(10) when he concluded that:

> Mr. Norris, extremely intoxicated and very angry himself, put that rifle down close to Lisa [Booth's] neck and pulled the trigger. And that's how Lisa [Booth] died. So this case does not approximate manslaughter. It is on the upper end of the second-degree murder cases.

Norris argues that his conduct did not approach the blameworthiness of first-degree murder (intentional homicide). Norris relies upon his version of the offense (that he did not point the rifle at Booth, and that the rifle discharged only because Booth grabbed it), as well as on the fact that the jury rejected first-degree murder and second-degree murder under subsection (a)(1) (that is, these jurors refused to find that Norris had acted with intent to kill or intent to cause serious physical injury or with knowledge that his conduct was substantially certain to cause death or serious physical injury).

However, Judge Schulz was not bound by the jury's view of the evidence. See *Brakes v. State*, 796 P.2d 1368, 1370–73 (Alaska App.1990). In his sentencing remarks quoted above, Judge Schulz rejected Norris's version of events and explicitly found that Norris had "put the rifle ... to [Booth's] neck and pulled the trigger". This conclusion finds substantial support in the evidence. Even if Norris (because of his intoxication or otherwise) lacked an intent to kill Booth, Judge Schulz was justified in concluding that Norris's conduct and mental state approached the culpability of first-degree murder. Given Judge Schulz's finding that Norris's offense was an aggravated second-degree murder, Judge Schulz was authorized to consider sentences above the 20– to 30–year benchmark range. *State v. Krieger*, 731 P.2d 592, 595–96 (Alaska App.1987); *Page*, 657 P.2d at 855.

In addition to Norris's criminal history, Judge Schulz also heard the testimony of a defense expert, psychologist David Doleshal. Doctor Doleshal testified that Norris had a history of substance abuse, that many of Norris's offenses seemed to be alcohol related, that Norris was defensive about his anti-social behavior, and that Norris had told him he saw no need for counseling. Nevertheless, Dr. Doleshal believed that Norris could benefit from long-term therapy.

Judge Schulz commented that, based on Dr. Doleshal's report as well as the letters sent by Norris's family and friends, he had abandoned his initial view that Norris should receive a sentence appropriate to a serious first-degree murder case, and had come to a more favorable view of Norris's offense. Nevertheless, Judge Schulz noted that Norris had a serious problem with alcohol and that, despite "plenty of warning over a long, long period of time", Norris refused to confront this problem. He accepted the idea that Norris was still amenable to treatment, but, echoing Dr. Doleshal, he found that Norris would require long-term, intensive treatment.

Judge Shulz, moreover, believed that Norris's lengthy criminal history was a "significant indicator of what we can expect [from Norris] in the future", and that, given this history and the seriousness of Norris's present offense, the sentencing

goal of rehabilitation should not receive great weight in determining Norris's sentence. Instead, Judge Schulz concluded that Norris's sentence should stress the sentencing goals of reaffirmation of societal norms and specific deterrence (deterring Norris from future criminal acts).

Judge Schulz's remarks demonstrate a careful consideration of the sentencing goals specified in AS 12.55.005 and *State v. Chaney*, 477 P.2d 441 (Alaska 1970). Norris argues that the superior court should have taken a more favorable view of his offense and should have given more weight to his prospects for rehabilitation. But under *Asitonia v. State*, 508 P.2d 1023, 1026 (Alaska 1973), the sentencing judge has primary responsibility for weighing these sentencing goals in a particular case. We are to disturb the sentencing judge's determination only if it is clearly mistaken. *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974). Our review of the record convinces us that Judge Schulz's sentencing decision is not clearly mistaken.

The judgement of the superior court is AFFIRMED.