George F. GOTTSCHALK, Jr., Appellant,

v.

STATE of Alaska, Appellee.

No. A–4863.

Court of Appeals of Alaska.

Oct. 7, 1994.

Christine S. Schleuss, Schleuss & McComas, Anchorage, for appellant.

John A. Scukanec, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Acting Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

## OPINION

BRYNER, Chief Judge.

George F. Gottschalk, Jr., was convicted by a jury in Naknek of first-degree assault. Gottschalk appeals, contending that Superior Court Judge Peter A. Michalski erred in excluding evidence of the victim's violent character. We reverse.

## FACTS

### A. *The Stabbing*

Early in the morning on June 12, 1992, at Gottschalk's home in Naknek, Gottschalk

stabbed his twenty-two-year-old son Clayton in the neck and seriously wounded him. James Woods, Jr., a friend of Gottschalk and Clayton, was present at the time of the incident. Immediately after being stabbed, Clayton, bleeding profusely, ran to the nearby house of Laurie Anderson, yelling that he had been stabbed and needed a ride to the clinic. While waiting for help to arrive, Clayton told Anderson, "I want George Gottschalk, Jr., brought up on attempted murder charges."

As Clayton sought help from Anderson, Woods ran to the home of another neighbor, Dawn Johnson, screaming, "Call 911, call 911, George [Gottschalk] stabbed Clayton in the neck." Woods told Johnson that:

> him, Clayton, and George were ... drinking together and then George went to bed in his room, and him and Clayton passed out on the floor. He said he was awoken by George coming down the hall screaming, "Clayton, you son of a bitch, you son of a bitch." He said he was still half out of it, so he was kind of opening his eyes and shutting them, and in and out. And he said then the next time when he opened his eyes, George was leaning over Clayton. And as he said to himself, "He's not going to do that," George cut Clayton's neck.

## B. *The State's Case at Trial*

The state subsequently charged Gottschalk with first-degree assault, in violation of AS 11.41.200(a)(1),[1] for recklessly causing serious physical injury to Clayton by means of a dangerous instrument. Based on Clayton's and Woods' post-stabbing statements, the state asserted that Gottschalk had become angry at Clayton and had stabbed him without provocation. By the time Gottschalk's case was tried, however, both Clayton and Woods had become reluctant witnesses.

At trial, Clayton testified that he and his father had been arguing intermittently during the night of the incident and the preceding day. Shortly after midnight, while he,

Woods and Gottschalk were drinking at Gottschalk's house, the argument started anew, and Gottschalk told him to leave. Clayton left and spent the next several hours at a friend's house, where he "[h]ad a couple more shot[s]." At about 5:00 a.m., he returned to Gottschalk's house, walked in, and sat down in a chair.

According to Clayton, Gottschalk, still angry, again asked him to leave. An argument ensued. Gottschalk went to the kitchen; Clayton could hear Gottschalk "fumbling around" in the knife drawer, so Clayton decided to leave. He bent over to put his shoes on; as he began to stand up, Clayton suddenly felt "warm blood ... [c]oming out of [his] neck." Clayton testified that he then "jumped up and ... said you stabbed me, you stabbed me, and ... ran out the door." To the apparent surprise of the trial prosecutor, Clayton added:

> I didn't even know if he even tried to stab me, you know.... I was getting up out of the chair. You know, he ... might have just came over there to show me the way out. I don't know. Because I was getting up like this. And I got up.
>
> ....
>
> I don't know. Because I wasn't looking at him. I didn't see him thrust it at me or anything like that.

For his part, Woods testified that on the night of the incident he had been drinking "[a]ll over" and "passed out" shortly after he arrived at Gottschalk's. He awoke to the sound of Gottschalk getting up in the morning and a short time later saw Gottschalk leaning over Clayton, who slept; Gottschalk held a knife to Clayton's neck. Then, according to Woods, "Clayton got up I guess and bumped into the knife or something because George was over him like that.... You know, must have got scared and jumped or something." Woods added, "He got poked. He never got stabbed."

---

1. At the time of this offense, AS 11.41.200(a)(1) provided:

   **Assault in the first degree.** (a) A person commits the crime of assault in the first degree if

   (1) that person recklessly causes serious physical injury to another by means of a dangerous instrument[.]

The prosecution impeached Clayton and Woods by introducing various prior inconsistent statements they had made, including the statements they made to Laurie Anderson and Dawn Johnson shortly after the stabbing.

## C. *Gottschalk's Testimony*

Gottschalk's defense at trial combined elements of self-defense and accident. Gottschalk testified that he ordered Clayton out of his house because Clayton had been drinking, had become belligerent, and had assaulted him. Clayton refused to leave. Fearing a further assault, Gottschalk armed himself with a knife from the kitchen. Gottschalk returned to the living room, repeated his request for Clayton to leave, "[a]nd I was telling him that I wanted him to please leave.... And ... he said, fuck you, old man, and he jumped right out of the chair and he came right after me. And ... I guess that's when he got hurt on the—got the cut on his neck." On cross-examination, Gottschalk insisted that he had picked up the knife as a "deterrent" because he "didn't want to get kicked around again," but that he "never intended to use it."

## D. *The Excluded Character Evidence*

To support his claim of self-defense and to establish that Clayton had been the initial aggressor in the incident, Gottschalk attempted to testify and to present testimony from four witnesses concerning Clayton's character for violence.

Gottschalk himself proposed to testify about two instances (one in 1991, the other in 1992) in which he posted bail for Clayton after Clayton had been arrested for what Gottschalk believed were assaultive crimes. Gottschalk also offered to describe a recent incident in which he took Clayton to the clinic for treatment of a severe slash on his leg that Gottschalk thought Clayton had sustained in an alcohol-related confrontation. Clayton fled the clinic and resisted treatment.[2]

Judge Michalski excluded this evidence, saying: "The conduct involved there is not conduct that involves the use of deadly force that would make it appropriate to use deadly force in return. And therefore it's not relevant."

Through cross-examination of Dawn Johnson, Gottschalk offered to present evidence of an incident occurring three years previously in which Clayton, while drinking in a restaurant, pulled a whiskey bottle from his coveralls and threatened a restaurant employee with it. The incident resulted in Clayton's forcible removal from the restaurant.

Judge Michalski excluded this evidence, finding that it was irrelevant to show Gottschalk's fear of Clayton because Gottschalk had not been aware of it and that it was too remote and *"de minimis"* to show violent character.

Through Ralph Mancuso, Gottschalk's brother-in-law, Gottschalk sought to present reputation and opinion evidence concerning Clayton's violent character and his tendency to become aggressive when intoxicated. Mancuso proposed to testify that Clayton had a reputation for being "violent when he gets drunk." In addition, Mancuso would have testified that he had personal knowledge of Clayton's proclivity for violence and untrustworthiness when drunk. As an example, he described an incident in August of 1991 when Clayton appeared at his house "obviously intoxicated" and "started ranting and raving and calling me all kinds of names." Mancuso refused to allow Clayton inside the house; Clayton refused to leave until Mancuso told Clayton that he had called the police.

Judge Michalski concluded that, as reputation and opinion evidence, Mancuso's proposed testimony did not go to "a trait specific to ... the defense to the crime charged," and that, essentially, it tended to show only that "someone when they're drunk out of their mind, ... is that way, ... they're drunk out of their mind."

---

2. Although it was eventually established that Clayton's leg injury actually resulted from a snowmachine or "three-wheeler" accident, Gottschalk claimed he was unaware of the cause at the time of Clayton's stabbing.

Gottschalk offered his sister, Glenda Williams, in whose home Clayton had lived "[o]ff and on" since he was eighteen, to state her opinion of Clayton and her knowledge of his reputation for being "totally a different person when he's intoxicated" with "a mean streak, a violent streak." She testified that she heard about Clayton's violent behavior from bartenders and others in the community, and explained that "my sons and him they just kind of like split apart because of the fact that when [Clayton] was drinking, that he would be too violent." Williams also described an incident that she had seen from a neighbor's window three years earlier: Clayton had held up a baseball bat and a two-by-four while arguing with Gottschalk. Williams admitted that she had not heard the conversation between Gottschalk and Clayton and did not know if Clayton was drunk at the time. Judge Michalski ruled Williams' opinion and reputation testimony inadmissible because "the testimony only goes to show that when he's drunk, he acts like he's drunk." The judge precluded Williams from testifying about the baseball bat incident because it was remote and evidently unconnected with intoxication.

Finally, Gottschalk sought to call Abe Williams—Glenda Williams' twenty-one-year-old son and a longtime acquaintance of Clayton who had many friends in common with him—to express his opinion that Clayton "fights with whatever he can fight with" and becomes "uncontrollably violent" when drinking, and that "[a] lot of people talk about it[.]" Abe Williams offered to testify that "in one of his violent stages [Clayton] doesn't like to lose. He'll keep coming back for more, and more, and more." Williams further indicated that Clayton provoked a fight with him at his eighteenth birthday party, that they fought and then stopped, but that Clayton returned later to initiate a second fight. Williams acknowledged, however, that

he had never known Clayton to use weapons during the fights.

Judge Michalski excluded Abe Williams' proposed testimony as irrelevant. Finding the relevant character trait in the case to be whether Clayton "has a reputation for, or is known for, or uses deadly force," the judge concluded that "[t]here's no evidence to that effect in the testimony of Abe Williams."

The trial court did allow Gottschalk to describe two prior violent confrontations with Clayton. Gottschalk testified that during the last week of May 1992, Clayton became drunk, blamed Gottschalk for an unsuccessful fishing expedition, "flipped" Gottschalk over and kicked him in the ribs, breaking them. The following week, Gottschalk testified, Clayton again became argumentative while he was with Gottschalk at a friend's house. Gottschalk "ended up on the ground again . . . and got roughed up pretty bad[.]" Clayton then left, and Gottschalk decided to stay overnight at his friend's house. According to Gottschalk, however, Clayton later returned and started jumping on him while he was asleep in bed. Gottschalk testified that other occupants in the house quickly "got [Clayton] out of the house."

## DISCUSSION

The jury convicted Gottschalk as charged. On appeal, Gottschalk contends that the superior court erred in excluding the proffered evidence of Clayton's violent character.

### A. *Applicable Law and Standard of Review*

Alaska Rule of Evidence 404(a)(2) allows the accused in a criminal prosecution to offer "[e]vidence of a relevant trait of character of a victim of crime[.]"[3] Under A.R.E. 405(a), the character of a person must ordinarily be proved by opinion or reputation evidence; under A.R.E. 405(b), however, the accused may offer evidence of specific instances of

---

**3.** A.R.E. 404(a)(2) reads:

(a) **Character Evidence Generally.** Evidence of a person's character or a trait of character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

. . . .

(2) *Character of Victim.* Evidence of a relevant trait of character of a victim of crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor[.]

the victim's conduct when a "trait of character of [the victim] is an essential element of a ... defense[.]"[4]

■ It is well settled that, in an assault case involving a claim of self-defense, these rules allow the accused to prove the violent character of the victim. The Alaska Supreme Court has indicated that the proof may be made by evidence of reputation, opinion, or specific instances of violent conduct. *See Loesche v. State,* 620 P.2d 646 (Alaska 1980); *Byrd v. State,* 626 P.2d 1057 (Alaska 1980); *Keith v. State,* 612 P.2d 977 (Alaska 1980). *Compare* 2 Wigmore, *Evidence* § 248 (Chadbourn rev. 1979) (favoring admission of specific instances of the victim's violent behavior which are known to the defendant) *with* 1A *id.,* §§ 63–63.1 (Tillers rev. 1983) (specific instances of the victim's violent behavior which are unknown to the defendant are generally not admissible).

■ Once the accused fairly puts self-defense in issue, the trial court may admit such evidence to show: "(1) who was the aggressor, in which case defendant's knowledge of the incident is immaterial; and (2) that defendant acted reasonably in using the degree of force he did, in which case defendant must know of the victim's past acts of violence." *Amarok v. State,* 671 P.2d 882, 883–84 (Alaska App.1983) (citing *Loesche,* 620 P.2d at 650–51). The decision to admit evidence concerning the victim's character for violence is within the discretion of the trial court. *Loesche,* 620 P.2d at 651; *Amarok,* 671 P.2d at 884. The trial court's evidentiary rulings will not be disturbed on appeal in the absence of an abuse of discretion. *Hawley v. State,* 614 P.2d 1349, 1361 (Alaska 1980); *Bodine v. State,* 737 P.2d 1072, 1073–74 (Alaska App.1987).

### B. Irrelevance of Character Evidence to Accident as a Basis for Exclusion

The state initially argues that exclusion of the disputed character evidence was justified because the actual theory of defense Gottschalk relied on was accident, not self-defense. The state cites *Byrd* for the proposition that evidence of a victim's violent nature is irrelevant to support a claim of accident. But the state's reliance on *Byrd* is misguided.

*Byrd* involved a combined claim of self-defense and accident: Byrd drew his gun in anticipation of an assault by his victim; Byrd's victim approached and reached for the gun; the gun discharged. *Byrd,* 626 P.2d at 1058. Byrd's defense theory was that he "either fired the gun in self-defense because of the apprehended danger ... or that the shooting was accidental." *Id.* In reviewing these factual circumstances, the supreme court, while noting in passing that evidence of the victim's violent character had no bearing on Byrd's claim of accident, concluded that this evidence would have been relevant to his claim of self-defense. *Id.*

The present case, like *Byrd,* involved a combined claim of self-defense and accident: Gottschalk testified that he armed himself with a knife in fear of an attack by Clayton; when Clayton did attack, Gottschalk's reflexive reaction resulted in Clayton's injury. There is nothing logically inconsistent or legally incongruent in the combined self-defense/accident theory that Gottschalk relied on for his defense. Far from being mutually inconsistent or contradictory, Gottschalk's claims of self-defense and accident were integral and necessary components of his defense. Because Gottschalk was charged with first-degree assault for recklessly injuring Clayton, his claim of accident might have been insufficient had it not been accompanied by the claim of self-defense. Without the claim of self-defense, the jury could easily have accepted Gottschalk's claim that the actual stabbing was inadvertent, while none-

4. A.R.E. 405 reads:
**Methods of Proving Character.**
(a) **Reputation or Opinion.** In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation in any community or group in which the individual habitually associated or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.
(b) **Specific Instances of Conduct.** In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of his conduct.

theless concluding that he was guilty because he had acted recklessly in arming himself in the first place.

■ In short, nothing about Gottschalk's claim of accident made it less vital for him to convince the jury that Clayton was the initial aggressor and that Gottschalk's decision to arm himself with a knife and his open display of the knife immediately prior to the stabbing were justified by his reasonable fear of danger from Clayton. And nothing in *Byrd* suggests that, under these circumstances, character evidence tending to show Clayton's violent propensities was irrelevant to Gottschalk's claim of self-defense.[5]

## C. *Abuse of Discretion*

■ The state also argues that, even if Gottschalk's claim of accident did not render the issue of Clayton's character irrelevant, the trial court did not abuse its discretion in excluding the disputed character evidence. We disagree. Here, Clayton's status as the initial aggressor and Gottschalk's apprehension of danger from Clayton were both hotly disputed issues. The state vigorously sought to establish that Clayton had been entirely passive before the stabbing and that Gottschalk had no reason to fear him whatsoever. *Cf. Byrd,* 626 P.2d at 1058–59 (exclusion of victim's prior assault conviction harmless when victim's status as initial aggressor was undisputed and accused's unawareness of pri-

or conviction precluded any possibility that it enhanced accused's fear). Furthermore, the proffered character evidence was not cumulative. *Cf. Loesche,* 620 P.2d at 651; *see also Norris,* 857 P.2d at 352. Although Gottschalk was allowed to describe two prior confrontations between himself and Clayton, the jury may well have discounted Gottschalk's description as self-serving, particularly because Clayton's testimony concerning the prior confrontations minimized them and suggested that Clayton had acted in self-defense when he injured Gottschalk's ribs.[6]

■ The trial court has considerable discretion to weigh the probative value of character evidence against its prejudicial potential, to regulate the amount of character evidence received, and to determine the form in which it should be admitted. In the present case, a good deal of the disputed evidence concerning specific instances of Clayton's misconduct—particularly the incidents of which Gottschalk was unaware—could properly have been excluded as too remote or as inadequately related to the two issues for which they were ostensibly offered: whether Clayton likely was the first aggressor and whether Gottschalk could reasonably have feared for his safety, given what he knew about Clayton's violent temperament. However, the trial court's decision to exclude all of the proffered character evidence, particularly the strong opinion and reputation testi-

---

5. The state's further reliance on *Norris v. State,* 857 P.2d 349 (Alaska App.1993), is equally misguided. Norris was charged with murder for the shooting death of his female companion. Although Norris had arguably armed himself with a rifle because he feared that his victim would assault him, the undisputed evidence at trial established that he thereafter assaulted his victim. He smashed her in the face with the rifle, knocked her to the floor, and pointed the gun at her head as he straddled her. *Id.* at 352. Norris claimed that the rifle accidentally discharged when his victim reached for the barrel. Norris did not maintain that he feared his victim at the time of the shooting. He sought to introduce evidence of the victim's prior violent acts, not to pursue a claim of self-defense, but to support his theory of accident. Indeed, on appeal, Norris implicitly conceded that he presented no evidence of self-defense. *Id.* In rejecting Norris' argument that the disputed character evidence had improperly been excluded, we concluded that, "[g]iven [the] progress of events" after Nor-

ris armed himself, "the reasonableness of [his] initial decision to pick up the rifle had essentially no bearing on [his] guilt," because that decision "would not affect the reasonableness of Norris's act of threatening an unarmed and helpless person with a loaded firearm when he feared no immediate danger from her." *Id.* In the present case, under Gottschalk's version of events, there was no "progress of events" dispelling his fear of Clayton; to the contrary, Gottschalk's testimony indicated that Clayton's conduct confirmed the fear that originally led Gottschalk to arm himself with the knife.

6. In fact, in the state's closing argument to the jury, the prosecutor argued that the prior conflicts between Gottschalk and Clayton were trivial; the prosecutor went on to argue that "in this case there's a distinct zero. There's a distinct absence of any evidence involved in the relationship with George Gottschalk and Clayton Gottschalk that would require him to use deadly force to protect himself."

mony, amounted to a clear abuse of discretion.

Clayton's lack of reputation for using weapons or engaging in deadly violence, while perhaps relevant to the weight of the character testimony, is not determinative of its admissibility. The chief probative force of this evidence was to establish the likelihood that Clayton was the first aggressor, not the likelihood of his using deadly force. Neither is it determinative that witnesses like Mancuso could not remember the exact sources for their knowledge of Clayton's reputation. The traditional view is that, to be admissible, evidence of reputation must be "broadly general rather than that of a particular group[.]" *See* A.R.E. 405(a) Commentary at 456 (1994) (quoting Mason Ladd, *Techniques and Theory of Character Testimony*, 24 Iowa L.Rev. 498, 513 (1939)).

Moreover, we are aware of no basis for the trial court's belief that the proffered evidence of Clayton's violent character when intoxicated—such as Abe Williams' proposed testimony that Clayton becomes "uncontrollably violent" when drinking and that, "in one of his violent stages he doesn't like to lose. He'll keep coming back for more, and more, and more"—would have shown nothing more than Clayton's tendency to act like a drunk when he became intoxicated. For some individuals, intoxication may invariably trigger violent aggression, but for many it does not. Certainly the jury might have found it useful to hear evidence indicating that Clayton fell into the former category, not the latter.

Finally, we find no realistic indication that this character evidence would have been particularly prejudicial: this was not the type of evidence that would typically risk arousing deep-seated hostility among jurors; it would seemingly not have been time-consuming; and, in context, it would apparently have posed little danger of distraction. *See Keith*, 612 P.2d at 983–84 (listing these factors as the common components of prejudice warranting exclusion of character evidence).

Our review of the record convinces us that the trial court erred in excluding the disputed character evidence in its totality. Given the substantial quantities of alcohol admittedly consumed by both Clayton and Woods on the night of the alleged assault, their numerous inconsistent statements describing the incident, and the potentially powerful effect of the excluded character evidence, we are further convinced of the strong likelihood that this error appreciably affected the jury's verdict. *Love v. State*, 457 P.2d 622, 632 (Alaska 1969).

## CONCLUSION

We therefore conclude that Gottschalk's conviction must be reversed.

The conviction is REVERSED.