Timothy S. BAKER, Appellant,

v.

STATE of Alaska, Appellee.

No. A–7259.

Court of Appeals of Alaska.

April 20, 2001.

Marcia E. Holland, Assistant Public Defender, Fairbanks, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Ben M. Herren, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

### OPINION

MANNHEIMER, Judge.

Timothy S. Baker appeals his convictions for two felonies: interference with official proceedings (threatening a witness or offering a bribe to a witness to get them to change their testimony), and first-degree witness tampering (attempting to induce a witness to offer false or misleading testimony, or to unlawfully withhold their testimony).[1] He contends that the evidence presented at his trial is insufficient to sustain his convictions. He further contends that there was a fatal variance between the State's proof at grand jury and its proof at trial. Finally, Baker contends that the interference with official proceedings statute and the witness tampering statute are unconstitutionally vague or overbroad. For the reasons explained here, we reject Baker's contentions and affirm his convictions.

*Underlying facts and brief procedural history*

Because Baker's claims require us to assess the evidence in the light most favorable to upholding the jury's verdicts, we present the evidence in that light.

One afternoon in April 1998, Timothy Baker was sitting in a parked car near a Fairbanks apartment complex, smoking marijuana with a friend, when a police officer drove by. Baker knew this officer from prior encounters. Because Baker was on felony probation, and because there was a handgun in the car, Baker decided to put some distance between himself and the car.

Baker and his friend got out of the car, and Baker walked up to Marsha Nesmith, a woman who lived in the apartment complex and who was standing outside, barbecuing. Baker was a friend of Nesmith's brother, and so he was acquainted with Nesmith.

As Baker approached Nesmith, he threw his car keys at her. Baker told Nesmith that, if anyone asked, she should say that she had been driving the car. Baker explained that there was a gun in the car and thus he could get in trouble if the police found out that he had been driving the car.

At about this time, the police officer whom Baker had seen a few minutes earlier returned to the apartment complex. He was soon joined by a second officer. Baker walked up to these officers and began con-

---

1. AS 11.56.510(a) and AS 11.56.540(a), respectively.

versing with them. Baker then told the officers that he had left his coat in Nesmith's apartment, that he was going to retrieve it, and that he would be right back. As Baker walked away, he passed by Nesmith and again told her to say that she had been driving the car.

After Baker left, Nesmith went up to the police officers and informed them that there was a gun in the car and that Baker had asked her to say that she had been driving the vehicle. The officers looked inside the car and found a handgun; they also found Baker's coat.

At this point, the building manager asked the police to remove Baker and his friend from the property. A little later, Baker and his friend left voluntarily. As they were leaving, a bystander heard Baker exclaim that "the bitch [had] better shut her mouth, or I'll shut it for her." The bystander could not tell whether Baker was speaking about the building manager or Nesmith.

Later that day, Nesmith was inside her apartment giving a statement to the police when the telephone rang. It was Baker. He asked Nesmith if she had told the police that she was the driver of the car. He reiterated how much trouble he could be in if the police found out that he was driving the vehicle. At this point, Nesmith handed the telephone to one of the officers, who informed Baker that they had found the gun inside the car. Upon hearing this, Baker ended the conversation.

Baker called Nesmith again later that night. He demanded to know what Nesmith had told the police. He reminded her again how much trouble he could be in if the police linked him to the car. Nesmith told Baker that if he wanted to know what she had said to the police, he should ask the police.

The next day, Baker's probation officer contacted him and told him that he would be seeking to terminate Baker's probation because Baker possessed a handgun.

During the next week (*i.e.*, between April 9th and April 16th), Baker made a series of calls to Nesmith, even though both Nesmith and her mother, and later the police, repeatedly told Baker to stop calling. One

evening, when the building manager was present in Nesmith's apartment, Baker called approximately six times within the span of an hour. After a couple days of repeated phone calls, Nesmith began to tape record Baker's calls.

In one of these telephone calls, Baker began the conversation with, "What are you doing, baby girl?" Nesmith told Baker that she could not talk to him right then because she was talking to her father about trying to obtain a car. Baker replied, "You need a car, girl? You need a car? That ain't no problem; that ain't no problem.... A car, that ain't no problem." Nesmith interpreted this comment to mean that, if she declined to testify against him, Baker would help her obtain a car.

On a subsequent occasion when Baker called, Nesmith hung up on him. Baker called right back. He made comments about what Nesmith was doing at that moment— comments that led Nesmith to believe that Baker might be spying on her. Baker suggested that if Nesmith was frightened, she should call the police. He also repeatedly urged her to say that someone else had been driving the car on April 9th.

Nesmith ultimately informed Baker that she was recording his calls. When Baker learned about the taping, he called Nesmith back and left a message saying that he bore her no hard feelings and that he was not mad at her.

Nesmith testified that Baker never threatened her directly, but she felt threatened by Baker's repeated phone calls. Nesmith became so scared that she stayed at her mother's home rather than live in her own apartment. Fearing for her own safety and that of her children, Nesmith made plans to move from Alaska.

On May 14, 1998, a grand jury indicted Baker for first-degree witness tampering and for interference with official proceedings (both on the theory that he threatened Nesmith and on the theory that he offered her a bribe).[2] Baker was convicted of these crimes following a jury trial.

---

**2.** Baker was also indicted for third-degree weap-

ons misconduct (felon in possession of a conceal-

At Baker's sentencing, Superior Court Judge Mary E. Greene ruled that Baker's two convictions should merge. She therefore imposed a single sentence of 4 years, 9 months' imprisonment, with no time suspended.

*The evidence is sufficient to support Baker's conviction for interference with official proceedings on the theory that he threatened Nesmith*

■ Baker was charged with the crime of interference with official proceedings, AS 11.56.510, under two alternative theories. First, the State alleged that Baker threatened Nesmith, knowing that she was a witness, with the intent to improperly influence her.[3] Second, the State alleged that Baker offered to confer a benefit on Nesmith, knowing that she was a witness, with the intent to improperly influence her.[4]

Baker contends that the State failed to present any evidence to support a finding that he threatened Nesmith. To analyze this contention, we must examine the definition of "threat" codified in AS 11.81.900(b)(60).

Under this statute, the term "threat" is defined as "[any] menace, however communicated," to engage in any of the types of conduct proscribed by the extortion statute, AS 11.41.520(a). For purposes of Baker's case, the pertinent types of conduct proscribed by the extortion statute are (1) "inflict[ing] physical injury on anyone", (2) "commit[ting] any other crime", and (3) "inflict[ing] any other harm which would not benefit the person making the threat".[5]

If Baker had expressly announced his intention to do any of these three things, his conduct would obviously have constituted a "threat". But AS 11.81.900(a)(60) declares that threats are not limited to express manifestations of an intent to do harm; rather, "threat" includes any menace, *however communicated.* Thus, if Baker communicated, by any means, his intention to inflict harm on Nesmith or his intention to commit any other

crime against Nesmith (or against anyone else), his conduct constituted a "threat" for purposes of the Criminal Code.

Over the course of a week, Baker telephoned Nesmith again and again, demanding to know what she had told the police and what she intended to tell the authorities in the future. On one occasion, Baker telephoned Nesmith six times within the same hour. He continued to make these telephone calls even though he was repeatedly informed that Nesmith did not wish to speak with him further. At one point, Baker commented on what Nesmith was doing at that moment—a comment that could reasonably be interpreted as an implied assertion that Baker was maintaining surveillance over Nesmith's residence.

Moreover, Baker's intention in making these telephone calls was potentially clarified by two of his actions at the time of the incident. First, Baker threw his car keys at Nesmith and directed her to tell the police that she had been driving the car. He explained to her that he would be in trouble if the police linked him to the car, because the car contained a gun. Second, as Baker walked away from the scene of the incident, he declared that "the bitch [had] better shut her mouth, or I'll shut it for her." Although there was some dispute as to which person Baker was referring to (Nesmith or the building manager), the jury might reasonably have found that Baker was talking about Nesmith.

Based on this evidence, the jury could reasonably conclude that Baker's conduct toward Nesmith constituted a "threat".

*The trial judge's failure to instruct the jury on the meaning of "threaten" was not plain error*

■ Baker's jury was instructed that, before Baker could be convicted of interference with official proceedings, the State had to prove (among other things) that Baker "threatened a witness, Marsha Nesmith".

---

able firearm), AS 11.61.200(a). The jury acquitted him of this charge.

**3.** *See* AS 11.56.510(a)(1).

**4.** *See* AS 11.56.510(a)(2).

**5.** AS 11.41.520(a)(1) and (a)(7).

On appeal, Baker argues that the trial judge should have given the jury an additional instruction defining the word "threaten" with more specificity.

However, Baker's trial attorney did not request such an instruction. Therefore, to prevail on appeal, Baker must demonstrate that the failure to give this type of instruction was "plain error"—that any competent attorney and judge would have recognized the need for such an instruction, and that the lack of such an instruction manifestly prejudiced the fairness of Baker's trial.[6] With respect to claims involving jury instructions, plain error will be found only when the purported flaw in the jury instructions created "a high likelihood that the jury followed an erroneous theory[,] resulting in a miscarriage of justice."[7]

Baker contends that a more elaborate definition of "threaten" was needed to forestall the possibility that the jury might find Baker guilty of threatening Nesmith based solely on Nesmith's subjective interpretation of Baker's conduct—her conclusion that Baker was trying to threaten her. From our examination of the record, we conclude that this possibility is unlikely.

In his summation to the jury, the prosecutor repeatedly argued that Baker should be convicted because he had intentionally tried to intimidate Nesmith into changing her story. The prosecutor never argued that Baker could be found guilty based simply on the fact that he made several telephone calls to Nesmith and, as a result, Nesmith became fearful.

The defense attorney's position was that Baker never made any threats to Nesmith, and that Baker could not be convicted based solely on Nesmith's subjective interpretation of Baker's phone calls. In his summation to the jury, the defense attorney argued that Baker never intended to threaten Nesmith and that he could not reasonably have foreseen that Nesmith would interpret his phone calls as a threat:

*Defense Attorney:* [Baker told Nesmith,] "Marsha, I'm not mad at you. I'm getting out [of jail] anyway. I just don't want any hard feelings." Boy—you know, that's threatening. Ladies and gentlemen, I'm going to submit to you that anybody saying those words would have no reason to believe that they were making a threatening gesture. Simply no reason whatsoever.

Now, maybe Tim called more times than he should have. You know, maybe . . . he should have cut it off because he was [getting] bothersome. But that, in and of itself, doesn't [prove] interference with official proceedings or witness tampering. . . . The issue . . . is not whether Ms. Nesmith felt herself to be threatened, or [felt herself to be] in a tough position. The issue in this case boils down to whether Tim Baker knew [that] the words he . . . was saying [constituted a threat], and [whether he] intended to threaten this lady.

In rebuttal, the prosecutor did not challenge the defense attorney's view of the law. Rather, the prosecutor responded that the defense attorney was taking an unreasonable view of the evidence. The prosecutor asserted that Baker knowingly made veiled threats to Nesmith to induce her to change her testimony, and that Nesmith interpreted those threats as any reasonable person would.

Based on this record, we conclude that there was no reasonable possibility that the jury found Baker guilty of making threats based solely on Nesmith's subjective reaction to Baker's telephone calls. Therefore, the trial judge did not commit plain error in failing to define the term "threaten" more specifically.

*The crime of interference with official proceedings does not punish speech protected by the First Amendment*

Baker contends that AS 11.56.510(a), the statute defining interference with official proceedings, is unconstitutionally broad be-

---

6. *See Marrone v. State,* 653 P.2d 672, 675–681 (Alaska App.1982); *Potts v. State,* 712 P.2d 385, 394 n. 11 (Alaska App.1985).

7. *Holiday Inns of America, Inc. v. Peck,* 520 P.2d 87, 91 (Alaska 1974).

cause it forbids people from engaging in speech that is protected by the First Amendment. Baker argues that he, for example, was convicted of this crime for making a series of telephone calls, "none of [which was] overtly threatening in any way".

AS 11.56.510(a) forbids a person from threatening or bribing a witness. Since threats and bribes are normally communicated through speech, the statute is obviously aimed at speech. However, the statute does not punish protected speech, for there is no First Amendment right to threaten someone else with harm.[8]

We addressed a similar contention in *Allen v. State*[9], where we upheld the terroristic threatening statute (AS 11.56.810) against a First Amendment challenge. We found that the terroristic threatening statute did not infringe First Amendment rights because the statute required proof (1) that the defendant knew that their report of a danger to human life was false, and (2) that the defendant was reckless as to the possibility that their false report would make another person fearful that someone would be injured.[10]

■ We likewise conclude that the interference with official proceedings statute does not infringe First Amendment rights. The pertinent portion of the statute requires proof that the defendant threatened someone with the intent of influencing the testimony of a witness. We agree that a defendant does not violate this statute simply because some other person has interpreted the defendant's conduct as threatening. Rather, to prove that a defendant has made a threat, the State must prove (at a minimum) that the defendant acted recklessly concerning the possibility that their words or conduct would be threatening to others—that their words or conduct, reasonably construed, communicated an intention to inflict harm.[11]

■ Baker conceivably is arguing that the statute is unconstitutional because it is not confined to overt threats—because it allows a person to be punished for making veiled threats. If this is Baker's argument, we reject it. As explained above, Alaska's statutory definition of "threat" includes "[any] menace, however communicated". The legislature's reason for including implied threats in this definition is obvious. Almost everyone is familiar with movies and television shows in which a mobster intimidates a witness by remarking that "accidents happen" or that "it would be too bad if something happened to your family". The Constitution does not protect threats, whether they be express or veiled.[12]

*The evidence is sufficient to support Baker's conviction for interference with official proceedings on the theory that he offered Nesmith a bribe*

■ As explained above, during one of Baker's telephone conversations with Nesmith, Nesmith told him that she could not talk to him because she was busy talking to her father about trying to obtain a car. Baker responded, "You need a car, girl? You need a car? That ain't no problem; that ain't no problem.... A car, that ain't no problem." On the basis of these comments, Baker was indicted for interference with official proceedings on the theory that he offered Nesmith a bribe to influence her testimony.

On appeal, Baker argues that no reasonable person could interpret his words as an offer of a bribe. Given the context in which Baker made these remarks, we disagree.

**8.** *See Petersen v. State,* 930 P.2d 414, 427 (Alaska App.1996).

**9.** 759 P.2d 541 (Alaska App.1988).

**10.** *See id.* at 545.

**11.** *See Petersen v. State,* 930 P.2d 414, 430–31 (Alaska App.1996); *DeHart v. State,* 781 P.2d 989, 990 (Alaska App.1989); *Wyatt v. State,* 778 P.2d 1169, 1170 (Alaska App.1989) (holding that, to establish that a defendant "recklessly" placed another person in fear of injury, the State must prove that the victim's fear was reasonable).

**12.** *See Commonwealth v. Chou,* 433 Mass. 229, 741 N.E.2d 17, 23 (2001); *People v. Borrelli,* 77 Cal.App.4th 703, 91 Cal.Rptr.2d 851, 861 (2000); *Planned Parenthood of the Columbia/Willamette, Inc. v. American Coalition of Life Activists,* 23 F.Supp.2d 1182, 1188–1190 (D.Or.1998).

*The jurors did not need to unanimously agree on whether Baker threatened Nesmith as opposed to offering her a bribe*

As explained, the State indicted Baker for interference with official proceedings under two different theories: that he threatened Nesmith in an attempt to influence her testimony, and that he offered Nesmith a bribe in an attempt to influence her testimony. However, the jury received a single verdict form for this charge; they were not asked to indicate whether they voted to convict Baker because they believed that he threatened Nesmith, or because they believed that he offered her a bribe.

On appeal, Baker argues that his conviction must be reversed because it is impossible to tell whether all twelve jurors voted for conviction under the same theory. But such unanimity was not required. The interference with official proceedings statute defines one offense but specifies several ways in which this offense may be committed. In such situations, when a defendant is charged with violating the statute in two or more ways, the jury need not unanimously agree on the particular way in which the defendant committed the crime, so long as all twelve jurors agree that he committed the crime in at least one of the specified ways.[13]

Baker argues that, even though jurors may not need to be unanimous on the legal theory that justifies a guilty verdict, they nevertheless must agree on the conduct that supports the verdict. Baker points out that, even under the State's view of the evidence, his offer to purchase a car for Nesmith occurred in one identifiable conversation, while his veiled threats occurred in several of the other conversations. From this, Baker argues that if the jurors could not reach unanimity concerning the theory of his guilt (threat or bribe), they also must have failed to reach unanimity concerning what particular conduct Baker engaged in.

But, again, this type of unanimity was not required. We addressed a similar argument in *Norris v. State*[14], a case in which the defendant was convicted of second-degree murder for shooting his girlfriend with a rifle. At trial, the State alleged that Norris intentionally shot his girlfriend during an argument. The defense claimed that the shooting was an accident: that Norris had been holding the rifle to prevent his girlfriend from doing anything rash, and that she grabbed the barrel and the rifle accidentally discharged.[15]

On appeal, Norris claimed that the jury should have been directed to indicate on their verdict form, what theory they were relying on to convict him of second-degree murder. Norris pointed out that some of the jurors might have thought that he intentionally shot his girlfriend, while other jurors might have believed Norris's account of events (*i.e.*, that the rifle discharged accidentally) but nevertheless concluded that his handling of the firearm manifested an extreme indifference to human life. Because the verdict form did not require the jurors to choose between these theories, Norris argued that he had been denied his right to a unanimous verdict: the jurors could have convicted him "without unanimously agreeing on the criminal conduct [that] Norris had committed."[16]

We rejected Norris's argument because it was based on a mistaken view of the unanimity requirement. We declared:

> [J]urors need not agree on a single interpretation of the evidence. They may reach differing conclusions as to what exactly was said or done during a particular episode, so long as they are all convinced that the defendant's conduct and culpable mental state(s) during that episode satisfy the elements of the crime. *See State v. Handran*, 113 Wash.2d 11, 775 P.2d 453, 456–57 (1989), in which the court held that it made no difference whether the jury believed that the defendant had kissed the victim without permission or had struck her, since both alleged acts of assault had occurred during the same, continuing

---

13. *See State v. James,* 698 P.2d 1161, 1165 (Alaska 1985); *Ward v. State,* 758 P.2d 87, 92 (Alaska 1988).

14. 857 P.2d 349 (Alaska App.1993).

15. *See id.* at 351–52.

16. *Id.* at 353.

course of conduct and each act independently constituted an assault.

In Norris's case, the jurors may indeed have been split on the issue of whether Norris intentionally fired the rifle into Booth's neck. However, even if some (or all) jurors believed that the rifle discharged accidentally when Norris stood over Booth and she grabbed the barrel, this interpretation of the evidence would still support the jury's verdict of second-degree murder. The jury instruction satisfied the [requirement of unanimity].

*Norris,* 857 P.2d at 354.

We reach the same conclusion in Baker's case. Baker engaged in a series of telephone conversations with Nesmith. The State alleged that during this series of conversations Baker made both veiled threats of harm and one bribe offer. Either a threat of harm or an offer of a bribe was sufficient to establish the *actus reus* of the offense, and the State's evidence was sufficient to support a guilty verdict under either theory. Accordingly, as we held in *Norris,* the jury did not need to unanimously agree on "what exactly was said or done during [this] episode, so long as they [were] all convinced that [Baker's] conduct and culpable mental state(s) during that episode satisf[ied] the elements of the crime." [17]

*There was no prejudicial variance between the State's proof at grand jury and the State's proof at trial with regard to the charge of interference with official proceedings*

██ When the State presented the case against Baker to the grand jury, the prosecutor submitted a proposed indictment that charged Baker with interference with official proceedings under two theories: that Baker threatened Nesmith, and that he offered her a bribe. In support of this proposed indictment, the prosecutor presented evidence of Baker's entire course of conduct between April 9th and April 16th. Witnesses testified about Baker's face-to-face conversations with Nesmith on April 9th and his remark, as he left the scene, that "the bitch [had] better shut her mouth". Witnesses also testified about the week-long series of telephone calls that commenced that evening, including the phone call on April 10th in which Baker apparently offered to obtain a car for Nesmith.

The prosecutor did not try to separate out the evidence supporting the two theories of culpability. Instead, he relied on Baker's entire course of conduct. Thus, the grand jury had Baker's entire course of conduct before them when they decided whether to indict Baker on the interference with official proceedings charge. Based on this evidence, the grand jury indicted Baker for interference with official proceedings on both theories (that he threatened Nesmith, and that he offered her a bribe).

But despite the fact that the jury heard evidence of Baker's conduct throughout the week of April 9th through 16th, the indictment charged Baker with committing the crime of interference with official proceedings "on or about the 9th day of April". Because the indictment expressly refers to April 9th, and because, at trial, the State again relied on Baker's week-long course of conduct, Baker contends that there is a fatal variance between the indictment and the evidence at trial.

Baker's trial attorney did not raise this issue in the superior court, so Baker must show that this discrepancy constitutes plain error.

██ One of the components of plain error is proof that the asserted error manifestly prejudiced the defendant. But Baker does not allege that he suffered any prejudice on account of this discrepancy. (Most notably, Baker's reply brief fails to allege that he was prejudiced, even after the State noted in its brief that Baker had made no claim of prejudice.) For this reason, we conclude that Baker has failed to establish plain error.

Additionally, we find no plain error because the record shows that Baker's trial attorney had a plausible tactical reason for failing to object to the purported discrepancy. As explained above, when the State presented Baker's case to the grand jury, the prosecutor relied on Baker's conduct as a

**17.** *Id.*

whole. The prosecutor relied on Baker's conduct throughout the week to prove the State's "threat" theory of prosecution. More significantly, the prosecutor relied on Baker's phone call of April 10th as the basis for the State's "bribery" theory of prosecution. Given this record, it appears that the indictment's reference to April 9th (as opposed to "April 9th through 16th") is likely a clerical error—or, at most, a drafting error that the superior court would have allowed the State to correct, pursuant to Criminal Rule 7(e), if Baker's attorney had raised the issue.

For these two reasons, Baker has failed to show that there was a manifestly prejudicial difference between the State's proof at grand jury and its proof at trial. The indictment's reference to "on or about April 9th" did not amount to plain error.

*There was no prejudicial variance between the State's proof at grand jury and the State's proof at trial with regard to the charge of first-degree witness tampering*

█ Baker makes a related variance argument concerning his conviction for witness tampering. Under AS 11.56.540(a), a person commits first-degree witness tampering if they knowingly induce or attempt to induce a witness to give false or misleading testimony in an official proceeding, or to unlawfully withhold testimony in an official proceeding. ("Official proceeding" is defined in AS 11.81.900(b)(40) as "a proceeding heard before a legislative, judicial, administrative, or other governmental body or official authorized to hear evidence under oath".)

With regard to this crime, Baker's argument is the reverse of the attack he made on the interference with official proceedings charge. The indictment expressly declared that Baker's conduct throughout the entire week of April 9th through April 16th was the *actus reus* of the witness tampering charge. But at trial, the prosecutor focused on Baker's conduct of April 9th rather than relying on the entire week's conduct. Baker now contends that this was a prejudicial variance.

Again, Baker's trial attorney made no objection to this purported discrepancy, so Bak-

er must show plain error. There is no plain error here.

Baker's variance argument rests on the assertion that, after a grand jury concludes that two or more of the defendant's acts, taken in combination, constitute the *actus reus* of a crime, the law forbids the prosecutor from arguing at trial that a smaller subset of the defendant's acts might be sufficient, in itself, to constitute the *actus reus*. We are aware of no such rule, and Baker offers no authority in support of this purported rule.

If the rule against variance is viewed from the standpoint of protecting defendants' right to advance notice of the allegations they must defend against, it would seem that defendants could not properly complain if the grand jury record contains many allegations and the prosecutor chooses to narrow the State's case at trial. Likewise, if the rule against variance is viewed from the standpoint of protecting defendants' right to a grand jury's independent review of the State's proposed charging decision, it would seem that defendants could not properly complain if the grand jury concludes that the charge is potentially proved in several different ways but the prosecutor chooses to argue only some of these evidentiary theories at trial.

Even if such a turn of events might conceivably prejudice a particular defendant under certain circumstances, Baker has again failed to allege that he was prejudiced by the prosecutor's decision to concentrate on the events of April 9th rather than the events of the entire week. For these reasons, we conclude that Baker has failed to demonstrate that there was a manifestly prejudicial difference between the State's proof at grand jury and its proof at trial. The fact that the prosecutor narrowed the State's theory of the witness tampering charge at trial did not amount to plain error.

█ Baker also contends that another plain error was committed when the prosecutor suggested at trial that Baker's intent was to induce Nesmith to offer false or misleading testimony at Baker's probation revoca-

tion hearing.[18] At grand jury, the State had alleged that Baker's intent was to induce Nesmith to offer false or misleading testimony at grand jury.

Baker contends that one essential element of any charge of witness tampering is the specific identity of the "official proceeding" whose outcome the defendant wants to affect. Thus, Baker argues, once the State committed itself at grand jury to the theory that Baker wanted Nesmith to lie in order to affect the outcome of the grand jury proceeding, the prosecutor was prohibited from arguing at trial that Baker's intent was to affect the outcome of the probation revocation hearing.

Baker's contention that the precise identity of the official proceeding is an essential element of the crime of witness tampering does not appear to be consistent with the legislature's definition of "witness". Under AS 11.56.900(6), "witness" means not only a person who is currently giving testimony at an official proceeding, and not only a person who has been summoned to give testimony at an official proceeding, but also "[any] person who the defendant believes *may be called* as a witness in an official proceeding, *present or future* ".

As explained above, the term "official proceeding" is quite broad. It encompasses all legislative, judicial, and executive branch hearings at which the presiding officers are authorized to place witnesses under oath. Thus, when someone violates the law, their conduct may potentially provide the impetus for several "official proceedings", some of which may not be convened until months or even years after the criminal act. A law breaker might wish to alter the outcome of all of these official proceedings—even the proceedings that are only conceivable and do not yet appear likely.

Because the number and nature of the resulting official proceedings may remain tentative for some time, and because the legislature has defined "witness" as including

people who potentially could be ·called to testify at some future official proceeding, it does not seem likely that the legislature intended to bar the government from charging a defendant with witness tampering unless the government could identify the specific official proceeding that the defendant intended to thwart. Rather, it appears that the "official proceeding" element of witness tampering should be treated in the same way as the "intent to defraud" element in a forgery or theft prosecution—where the precise identity of the defrauded victim is normally considered a non-material allegation of the indictment that can be amended to conform to the evidence at trial.[19]

We need not definitively resolve this issue of law in Baker's case because Baker raises this issue as a question of plain error. As we have just explained, there are good reasons for concluding that the precise identity of the official proceeding is not a material element of a witness tampering charge. Baker's brief contains conclusory statements that the identity of the official proceeding should be considered a material element, but he offers no legal authority directly on point. In the end, Baker has shown only that this issue might be debatable. But this means that he has failed to show plain error—for if competent judges could differ on the correct resolution of a legal issue, there is no plain error.[20]

*The evidence is sufficient to support Baker's conviction for first-degree witness tampering*

 Baker was charged with first-degree witness tampering for attempting to induce Nesmith to offer false or misleading testimony at an official proceeding—in particular, trying to persuade Nesmith to say that someone other than Baker had been driving the car. Baker contends that the evidence at trial was insufficient to support his conviction for this offense. This claim is frivolous.

*Baker's First Amendment challenge to the first-degree witness tampering statute*

 Baker contends that the witness tampering statute is overbroad. In essence,

---

18. As noted above, Baker was on felony probation at the time of these events; his smoking marijuana and his alleged possession of a handgun were both violations of his probation.

19. *See Hosier v. State,* 1 P.3d 107, 109 (Alaska App.2000).

20. *See Marrone v. State,* 653 P.2d 672, 676 (Alaska App.1982).

he argues that people have a First Amendment right to ask other people to lie or cover up for them. Baker cites no legal authority for this proposition, but assuming for purposes of argument that people do have such a constitutional right, it ends at the perjury statute's doorstep. That is, a person has no First Amendment right to ask other people to lie under oath or to try to persuade them to do so.

The major portion of Baker's argument on this issue actually consists of assertions that he should have been acquitted. Baker argues that the State failed to prove that, when he tried to persuade Nesmith to lie for him, he had any reason to believe that any official proceeding would take place. We disagree. The evidence, viewed in the light most favorable to the jury's verdict, supports the conclusion that Baker knew that one or more official proceedings might be convened to investigate or adjudicate his conduct.

*The jurors did not need to unanimously agree on what precise conduct justified Baker's conviction for witness tampering*

■ Baker raises a jury unanimity challenge to his witness tampering conviction (a challenge similar to the one he raised with respect to his interference with official proceedings conviction). Baker points out that, during the week of April 9th through April 16th, he engaged in several acts that, solely or in combination, might be viewed as witness tampering. Baker contends that he was denied his right to a unanimous verdict because the jurors were not asked to unanimously agree on the precise conduct that supported their guilty verdict.

As we explained when we rejected Baker's similar attack on his interference with official proceedings conviction, this type of jury unanimity is not required. Our decision in *Norris v. State* controls this issue.[21]

21. 857 P.2d 349, 354 (Alaska App.1993).

22. AS 11.56.510(b).

23. AS 12.55.125(d)(1).

*Baker's sentence is not clearly mistaken*

■ As already noted, Superior Court Judge Mary E. Greene ruled that Baker's two convictions should merge for sentencing purposes. She therefore entered judgement against Baker only for the more serious crime—interference with official proceedings, a class B felony.[22] Baker had one prior felony conviction, so he faced a presumptive term of 4 years' imprisonment.[23]

Because Baker was on felony probation when he committed the present offense, Judge Greene found that the State had proved aggravating factor AS 12.55.155(c)(20). In addition, Baker had a long string of misdemeanor offenses spanning the previous seven years. Based on Baker's criminal history and his conduct in the present case, Judge Greene concluded that Baker's potential for rehabilitation was "virtually nil". Because of Baker's poor potential for rehabilitation, the judge concluded that Baker's sentence should be increased by 9 months to serve based on the aggravating factor.

On appeal, Baker argues that Judge Greene should not have adjusted his sentence based on the aggravating factor, but rather should have imposed only the 4–year presumptive term. Baker points out that he received a suspended imposition of sentence for his prior felony, and that he has never previously served more than 30 days in jail. Thus, Baker contends, he has never "been given the opportunity for reformation in any meaningful fashion".

However, according to the information in the pre-sentence report, Baker has a long-standing pattern of criminal conduct, and he has never been deterred by his previous convictions. Judge Greene relied on this information when she assessed Baker's potential for reformation. She also considered the seriousness of Baker's present offense.

Having reviewed the sentencing record, we conclude that Baker's sentence of 4 years, 9 months to serve is not clearly mistaken.[24]

24. *See McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974) (an appellate court is to affirm a sentencing decision unless the decision is clearly mistaken).

*Conclusion*

AFFIRMED.

The judgement of the superior court is