NOTICE

*The text of this opinion can be corrected before the opinion is published in the*
<u>*Pacific*</u> <u>*Reporter*</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| WENDY CHRISTINE WILLIAMS, | Court of Appeals No. A-12244 |
| Appellant, | Trial Court No. 3AN-13-8491 CR |
| v. | |
| | O P I N I O N |
| STATE OF ALASKA, | |
| Appellee. | No. 2642 — April 5, 2019 |

Appeal from the District Court, Third Judicial District, Anchorage, Leslie Dickson, Judge.

Appearances: David T. McGee, Attorney at Law, Anchorage, under contract with the Public Defender Agency, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. Lawrence B. Monsma, Assistant District Attorney, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Coats, Senior Judge.[*]

Judge MANNHEIMER.

---

[*] Sitting by assignment made pursuant to Article IV, Section 11 of the Alaska Constitution and Administrative Rule 23(a).

Wendy Christine Williams was convicted of two counts of violating protective orders that prohibited her from contacting, communicating with, or stalking Kathleen Lansdale (the wife of Williams's former husband, Robert Lansdale) and the other members of the Lansdale family. *See* AS 11.56.740(a).

One of Williams's convictions was based on her conduct at a football jamboree in August 2013. Williams's other conviction was based on her conduct in an Anchorage parking lot a few months later.

With respect to the conviction arising from Williams's conduct at the football jamboree, Williams argues that she was denied her right to a unanimous verdict because the prosecutor openly argued to the jurors that Williams could be convicted of violating the protective order based on two different aspects of her behavior at the jamboree, and that the jurors did not need to reach unanimous agreement as to which aspect of Williams's behavior formed the basis of their verdict.

And with respect to both of Williams's convictions, Williams argues that the trial judge committed error by allowing the prosecutor to introduce evidence of three prior occasions when Williams violated earlier court orders that prohibited her from contacting the Lansdale family.

For the reasons explained in this opinion, we conclude that neither of Williams's claims has merit, and we therefore affirm Williams's convictions.

*The State's case against Williams*

Beginning in 2004, Williams and her former husband, Robert Lansdale, were embroiled in a bitter custody battle over their son, Israel. In 2010, Lansdale was granted sole custody of Israel (with Williams having a right of visitation). Throughout

these years, the superior court issued orders prohibiting the Lansdale and Williams families from contacting each other.

Williams repeatedly violated the superior court's orders by approaching or contacting Robert Lansdale and his new wife, Kathleen.

In March 2013, Kathleen Lansdale went to court and obtained another protective order against Williams. This 6-month protective order prohibited Williams from approaching or confronting Kathleen, watching or following her, or otherwise stalking her. In addition, the protective order prohibited Williams from directly or indirectly communicating with any member of the Lansdale family — including Israel — except for communications that were consistent with Williams's right of visitation.

In early August 2013, while this protective order was in effect, the Lansdale family attended a football jamboree in Anchorage. Israel was playing in this jamboree, and Robert and Kathleen were there to support him. Williams, too, attended this football jamboree, accompanied by her other son, Diego.

According to the testimony presented at Williams's trial, Williams was sitting high in the bleachers of the football stadium, and both Robert and Kathleen Lansdale observed her taking photographs of them and Israel. In addition, according to Robert Lansdale's testimony, Williams called out to Israel and beckoned him to come over to where she was sitting. Based on what transpired at this football jamboree, Williams was convicted of violating the March protective order.[1]

In early November 2013, Kathleen Lansdale went back to court and obtained another 6-month protective order against Williams. This second protective order contained the same provisions as the previous one.

---

[1] AS 11.56.740(a)(2).

Williams was convicted of violating this November 2013 protective order as well, based on events that took place on November 26, 2013 (about three weeks after the order was issued).

According to the testimony presented at Williams's trial, Robert Lansdale was sitting in his vehicle in a parking lot, waiting for his wife Kathleen to get off work. While Robert was waiting, he thought he saw Williams's current husband crouched behind a nearby garbage can.

Shortly thereafter, when Kathleen joined Robert, she observed Williams's car parked nearby. Williams was sitting in this car, and there was a camera propped on the dashboard, emitting a red light (*i.e.*, it appeared to be recording). Kathleen also saw Williams's son, Diego, taking photographs of her and Robert.

*The facts underlying Williams's claim that she was denied her right to jury unanimity*

As we indicated in the preceding section of this opinion, the State presented evidence that Williams's conduct at the football jamboree violated the protective order in two different ways: first, because Williams took photographs of Kathleen Lansdale, and second, because Williams beckoned to Israel.

At Williams's trial, the jury was instructed that Williams should be found guilty if the State proved either of these two things beyond a reasonable doubt — and that the jurors did not have to unanimously agree on which of these two things had been proved, so long as all the jurors agreed that one or the other was proved.

On appeal, Williams argues that this was constitutional error — that Alaska law required the trial judge to instruct the jury that Williams could not be convicted

unless the jurors reached unanimous agreement as to which of the two things had been proved.

Here is the factual background of Williams's claim:

At Williams's trial, both Robert Lansdale and Kathleen Lansdale testified about the events at the football jamboree.

During his direct examination, Robert explained that Williams was sitting in the bleachers at the jamboree and that, at one point, he observed Williams taking photographs of his family — him, Kathleen, and Israel — while the three of them were together.

Robert also mentioned, in passing, that Williams waved at Israel and called out to him, beckoning him to come over to where she was sitting. Robert did not specify whether this act of waving and beckoning occurred at the same time that Williams was taking the photographs, or at some different time during the jamboree.

When Williams's attorney cross-examined Robert, she devoted only a small portion of her examination to the topic of the football jamboree. In that portion of her cross-examination, the defense attorney asked Robert only general questions about the jamboree; she did not ask Robert to describe the specifics of Williams's behavior.

At three points during this cross-examination, Robert again asserted that Williams took photographs of him and his family, but he did not repeat his assertion about Williams's waving and calling out to Israel. Robert's comments did not evoke any particular response from the defense attorney, and she moved on to other areas of cross-examination.

Later, when Kathleen Lansdale took the stand, she too testified that she saw Williams taking photos of her and Robert and Israel while they were together at the jamboree. Kathleen stated that Williams had her camera pointed at the three of them for two or three minutes. The prosecutor did not ask Kathleen any questions about Williams

calling out to Israel or beckoning him to come over to her, and Kathleen gave no testimony concerning this aspect of Williams's behavior at the jamboree.

On cross-examination, Williams's attorney asked Kathleen several questions about the incident at the football jamboree. During this cross-examination, Kathleen reiterated that Williams was taking photographs of her, Robert, and Israel. But the defense attorney (like the prosecutor) did not ask Kathleen any questions about Williams's act of waving and calling out to Israel.

Thus, at the end of Williams's trial, the only testimony about Williams's waving and calling out to Israel was Robert Lansdale's passing reference to this occurrence.

When the trial judge and the attorneys met to discuss jury instructions, the prosecutor informed the judge and Williams's attorney that he would be arguing two different theories as to how Williams violated the protective order at the football jamboree. Specifically, the prosecutor argued that Williams violated the protective order by (1) photographing Kathleen Lansdale (one of the people protected by the order) and by (2) communicating with Israel (another person protected by the order).

A little later, the prosecutor gave the judge and the defense attorney copies of his proposed jury instructions on this issue.

The prosecutor's first proposed instruction, which was ultimately given to the jury as Instruction 11(a), informed the jurors that, under the terms of the protective order, (1) Williams was prohibited from approaching, watching, confronting, or otherwise stalking Kathleen, and (2) Williams was also prohibited from contacting or communicating with Israel (other than in connection with her court-ordered visitation).

The prosecutor's second proposed instruction, which was ultimately given to the jury as Instruction 11(b), informed the jurors that Williams could be found guilty if her conduct at the football jamboree violated either of these two provisions of the

protective order — and that the jurors did not need to reach unanimous agreement as to which of these two provisions Williams violated:

> With respect to the crime of violating a protective order described in Instruction 11(a), if you find that the state has proved beyond a reasonable doubt each of the acts listed the first sentence OR each of the acts listed in the second sentence, then you must find the defendant guilty.

> On the other hand, if you find that the state has not proved beyond a reasonable doubt each of the acts listed in the first sentence AND that the state has not proved beyond a reasonable doubt each of the acts listed in the second sentence, then you must find the defendant not guilty.

> To return a verdict of guilty, each of you individually must find the defendant guilty, but you need not agree among yourselves which of the two sets of elements the state has proved.

Williams's attorney objected to this instruction — but not because of its substantive content. The defense attorney voiced no objection to the idea that the jurors did not need to reach unanimous agreement as to whether Williams violated the protective order by photographing Kathleen or by communicating with Israel. Instead, the defense attorney objected that the prosecutor's proposed instruction did not make this concept clear enough.

The defense attorney told the trial judge that she thought the prosecutor's wording was "confusing", and that she was concerned that the jurors would not be able to understand the instruction. The defense attorney then offered her own suggestions for rewording the instruction to make the prosecutor's ideas clearer.

A little later, when the prosecutor delivered the State's summation, the prosecutor explicitly argued that the jury did not need to reach unanimous agreement as to whether Williams (1) photographed Kathleen Lansdale or (2) beckoned to Israel.

The prosecutor noted that both of these actions were violations of the protective order. And the prosecutor told the jury that, so long as each member of the jury found that Williams did *either* of these two things, then the jury should find Williams guilty — even if some of the jurors found that Williams photographed Kathleen and other jurors found that Williams communicated with Israel.

Consistent with the position she had taken during the earlier discussion of the jury instructions, Williams's attorney made no objection to any of the prosecutor's statements on this issue.

During her own summation to the jury, the defense attorney took the position that Williams had not violated the protective order at the football jamboree *in any fashion*. Rather than discussing and trying to rebut the details of Robert and Kathleen Lansdale's testimony, the defense attorney simply argued that Robert and Kathleen were not credible witnesses, and she urged the jurors not to credit their testimony. The defense attorney told the jurors, "Your decision comes down to [this]: Do you believe Kathleen Lansdale and Robert Lansdale beyond a reasonable doubt?"

*Williams's argument on appeal, and why we reject it*

On appeal, Williams takes the opposite position from the one espoused by her trial attorney: she now argues that it was constitutional error to tell the jury that they did not have to reach unanimous agreement as to whether Williams (1) photographed Kathleen Lansdale or (2) beckoned to Israel. More specifically, Williams argues that

these were two distinct criminal acts, and that she was therefore entitled to require the jury to reach factual unanimity as to which of these acts was proved.

In her briefs to this Court, Williams asserts that her attorney failed to object to Instruction 11(b) — the jury instruction that Williams now attacks — and Williams refers to her claim as a claim of "plain error".

But as we described in the preceding section of this opinion, Williams's trial attorney *did* object to this instruction. She objected on the ground that the instruction, as worded, *failed to adequately convey* the principle that the jurors did *not* need to be unanimous as to which aspect of Williams's conduct at the jamboree violated the protective order.

In other words, Williams's attorney endorsed the substance of the jury instruction, and she asked the court to rephrase the instruction to make that substantive principle even clearer. Given the defense attorney's actions, any error in the jury instruction was likely "invited error", not "plain error".

Williams's case is analogous to our decision in *Schlosser v. State*, 372 P.3d 272, 278 (Alaska App. 2016), where we concluded that any error in a trial judge's response to a jury question was invited error. In *Schlosser*, the defense attorney did not merely fail to object to the substance of the judge's response to the jury; rather, the defense attorney urged the judge to be more emphatic in his wording. This is essentially what occurred in Williams's case too.

Viewing Williams's case as an instance of invited error, we would reverse Williams's conviction only if his case presented an "exceptional situation where reversal

is necessary to preserve the integrity of the judicial process or to prevent a miscarriage of justice."[2] Williams's case does not present that kind of exceptional situation.

But even if we viewed Williams's claim as an assertion of "plain error", there are two reasons why we would not find plain error here.

First, as we have explained, Williams's trial attorney adopted an "all or nothing" approach to the State's allegations concerning Williams's conduct at the football jamboree. The defense attorney never cross-examined Robert and Kathleen Lansdale about the details of what happened at the jamboree. Instead, the defense attorney argued that the Lansdales' testimony, taken as a whole, should not be trusted, and that the State had failed to prove its allegations beyond a reasonable doubt.

In other words, given the way this case was litigated, there is no reasonable possibility that the jurors would have reached a different verdict if they had been told that they had to reach unanimous agreement as to whether Williams took photographs of Kathleen or beckoned to Israel.

Second, and more importantly, Alaska law does not provide a clear answer as to whether factual unanimity was required in Williams's case.

In order to resolve Williams's factual unanimity claim — to answer the question of whether the jurors were required to reach factual unanimity regarding Williams's conduct at the football jamboree — we must ascertain whether Williams's conduct would have supported two separate convictions for violating the protective order.

---

[2] *Johnson v. State*, 328 P.3d 77, 86 (Alaska 2014), quoting *Parson v. Alaska Housing Finance Corp.*, 189 P.3d 1032, 1038 (Alaska 2008).

This is ultimately a question of statutory interpretation — a question of determining the applicable "unit of prosecution".[3] As we explained in *Taylor v. State*, 400 P.3d 130, 134 (Alaska App. 2017), the requirement of factual unanimity only applies when "the State presents evidence that a defendant committed different acts that could each separately support a criminal conviction".[4]

If the variation in the evidence concerns only the theory under which the defendant's actions constitute the charged crime, then our law does not require the jurors to reach factual unanimity. For instance, in *State v. James*, 698 P.2d 1161, 1167 (Alaska 1985), the Alaska Supreme Court held that when a statute defines a crime as an act performed with one of multiple culpable mental states, the jury need not reach unanimous agreement as to exactly what culpable mental state the defendant had. As the *James* court explained, "where the alleged criminal deed is restricted to a single incident, any potential difference in the jurors' findings of intent versus wilful disregard is not significant". *Ibid.*

Nor is this doctrine of non-unanimity restricted to differences in culpable mental states. In *Gray v. State*, 463 P.2d 897, 911 (Alaska 1970), the supreme court expressly approved the practice of having a jury return a general verdict on the crime of first-degree murder, even though (under Alaska's former criminal code) this crime was defined in the disjunctive — as either a premeditated killing or an intentional killing performed during the commission of a felony. The supreme court explained that even though there may be several ways of committing a crime, if the defendant's conduct

---

[3]   *Thessen v. State*, 508 P.2d 1192, 1199 & n. 9 (Alaska 1973).

[4]   *See, e.g.*, *Ramsey v. State*, 355 P.3d 601, 602 (Alaska App. 2015); *Anderson v. State*, 289 P.3d 1, 4 (Alaska App. 2012); *Castillo v. State*, 821 P.2d 133, 136-37 (Alaska App. 1991); *Covington v. State*, 703 P.2d 436, 440 (Alaska App. 1985).

constitutes "only one crime", then "multiple theories [can] be presented to the jury", and the jury "[need] not ... choose between them." *Ibid.* [5]

Returning to the facts of Williams's case, the State presented evidence that Williams's conduct at the football jamboree violated the protective order in two ways: Williams photographed Kathleen Lansdale, and she beckoned to Israel. But only Robert Lansdale testified about the act of beckoning — and he mentioned this conduct only in passing, during his detailed description of the photographing. Neither the prosecutor nor the defense attorney asked Robert to explain whether Williams's act of beckoning to Israel occurred in conjunction with Williams's act of photographing the Lansdale family, or whether this act of beckoning occurred at some other discrete time.

Thus, the record does not clearly reveal whether the photographing and the beckoning were distinct acts that Williams performed at different times during the football jamboree, or whether the photographing and the beckoning were simply different aspects of one transaction between Williams and the Lansdale family.

And if the photographing and the beckoning were simply different aspects of one transaction, then it is unclear whether these acts would support separate convictions for violating the protective order.

There is no Alaska decision that defines the applicable unit of prosecution for violating a protective order in situations where a defendant has potentially violated

---

[5]   *See also Taylor v. State*, 400 P.3d 130, 135 (Alaska App. 2017) (no unanimity required regarding the different conduct that raised the defendant's act of eluding the police to a felony); *Nicklie v. State*, 402 P.3d 424, 427 (Alaska App. 2017) (no unanimity required regarding the various ways in which the defendant attempted to strangle the victim during a single attack); *State v. McDonald*, 872 P.2d 627, 655 (Alaska App. 1994) (no unanimity required regarding whether the defendant personally committed the murder or, instead, aided or abetted another person's commission of the murder).

different provisions of a protective order during a single encounter or transaction with the people who are protected under the order.

Conceivably, the law might allow a separate conviction for each Lansdale family member whose interests were violated. Compare *Cooper v. State*, 595 P.2d 648, 649-650 (Alaska 1979), where the supreme court upheld separate assault convictions when a defendant's threatening conduct with a weapon placed three people in fear of imminent serious injury.

On the other hand, since the basic purpose of the protective order was to protect the Lansdale family from Williams, the law might view Williams's conduct at the football jamboree as a single violation of this order, committed in different ways.

Compare *Baker v. State*, 22 P.3d 493 (Alaska App. 2001), a case in which the defendant was charged with "interference with official proceedings" (basically, attempting to unlawfully influence a witness) based on a series of telephone conversations with the witness. We held that factual unanimity was not required regarding whether the defendant threatened the witness or, instead, offered a bribe to the witness during this series of conversations. *Id.* at 500-01.

In sum, Alaska law does not currently provide a ready answer to the question of whether Williams's conduct at the football jamboree would support two separate convictions. And Williams has failed to adequately brief these issues. Although Williams argues that her case should not be analogized to *Baker*, she offers no significant analysis of *why* our decision in *Baker* is inapplicable — no significant analysis of what the unit of prosecution should be in cases like this.

For these reasons, we conclude that even if the jury instruction in Williams's case is not viewed as an instance of invited error — so that we must analyze Williams's claim under the rubric of plain error — the challenged jury instruction does not present an instance of plain error.

*The admission of evidence concerning earlier occasions when Williams violated protective orders that prohibited her from contacting the Lansdale family*

As we explained earlier, the background of this case is that, for over a decade, Williams and her ex-husband Robert Lansdale engaged in a bitter custody battle over their son Israel. During this time, Kathleen Lansdale obtained several protective orders against Williams — and Williams repeatedly violated those protective orders.

In the present case, the prosecutor asked the district court to admit evidence of nineteen of these prior violations. In response to the prosecutor's request, the court conducted extensive hearings to assess the admissibility of this evidence. Ultimately, the court concluded that most of these prior incidents were *not* admissible. But the court allowed the prosecutor to introduce evidence of four prior incidents in which Williams violated court orders that prohibited her from contacting the Lansdales.

With respect to one of these incidents, Williams's own attorney asked the court to admit the evidence (because this particular incident resulted in Kathleen Lansdale's being charged with assault). But Williams now challenges the court's decision to admit evidence of the other three incidents.

Williams argues that these prior incidents lacked any relevance, other than to show her propensity to violate court orders. Thus, Williams contends, the evidence was barred by Alaska Evidence Rule 404(b)(1).

But this is not a case where Williams's prior acts were introduced to show her general propensity to violate court orders. Rather, the fact that Williams had repeatedly violated court orders protecting the Lansdale family was relevant to show the depth of Williams's antipathy toward a specific group of people — the Lansdales.

This antipathy was relevant to the issues litigated at Williams's trial, because Williams's defense was that the Lansdales had misinterpreted innocent actions

on her part, and that her son Diego was actually the one who photographed the Lansdales. Thus, the challenged evidence had a case-specific relevance, and it was not barred by Evidence Rule 404(b)(1). [6]

Even though Evidence Rule 404(b)(1) did not categorically bar this evidence, the trial judge was nevertheless required to weigh the probative value of this evidence against its potential for unfair prejudice under Evidence Rule 403.

But as we have already explained, the trial judge carefully considered the entirety of the State's proposed evidence, and the judge ultimately limited the State to three of those prior incidents. (Evidence of a fourth incident was admitted, but this was at the request of Williams's attorney.) We conclude that the trial judge did not abuse her discretion in this matter.

*Conclusion*

The judgement of the district court is AFFIRMED.

---

[6] *See*, *e.g.*, *Riggins v. State*, 101 P.3d 1060, 1063 (Alaska App. 2004) (upholding the admission of evidence of the defendant's prior assaults on his girlfriend in a prosecution for a more recent assault on the girlfriend).